In re M & T ELECTRICAL
CONTRACTORS, INC.,
Debtor.

M & T Electrical Contractors,
Inc., Plaintiff,

v.

Capital Lighting & Supply, Inc.,
et al., Defendants.

Bankruptcy No. 95–00060.
Adversary No. 96–0004.

United States Bankruptcy Court,
District of Columbia.

April 9, 2001.

436

Roy B. Zimmerman, Alexandria, VA, Michael J. Goergen, Washington, DC, for debtor.

### DECISION ON MOTIONS FOR SUMMARY JUDGMENT

S. MARTIN TEEL, Jr., Bankruptcy Judge.

The court addresses various motions for summary judgment.

## I

### INTRODUCTION

The court sets the stage by describing the entities involved, the claims, and the disposition of the motions with respect to each claim.

### A. THE RELEVANT ENTITIES

M.A. Mortenson Company ("Mortenson") entered into a prime contract with the Washington Metropolitan Airport Authority ("WMAA") to expand the main terminal at Washington–Dulles International Airport ("Dulles Project"). Singleton Electric Co., Inc. ("Singleton") is a first-tier electrical subcontractor through a contract with Mortenson. The plaintiff M & T Electrical Contractors, Inc. ("M & T") is a second-tier subcontractor through a contract with Singleton; M & T's chapter 11 reorganization case will turn on the outcome of this proceeding. The defendant Capital Lighting & Supply, Inc. ("Capital") is a third-tier subcontractor through a contract with M & T. Fidelity and Deposit Company of Maryland ("F & D") is a surety company that issued to Singleton a performance and payment bond for the Dulles Project in November 1993, and entered into an indemnity agreement with Singleton. F & D also has claims against M & T (not arising from the Dulles Project) for which it has a security interest in M & T's accounts receivables. The Internal Revenue Service ("IRS") is owed taxes

by M & T, filed various notices of tax lien, and served notices of levy on Singleton and Capital to seize any funds owed M & T. The defendants C & A Investments, Inc. ("C & A") and the Comptroller of the Treasury of the State of Maryland ("the Maryland Comptroller") also asserted liens.

### B. *SUMMARY OF CLAIMS AND DISPOSITION OF MOTIONS*

The claims asserted, and the court's disposition of the motions for summary judgment regarding them, are as follows.[1]

Counts I through IV of M & T's amended complaint (DE No. 25) involve nonbankruptcy law claims directed to amounts owed to M & T for the work it did. Count I alleges breach of contract against Singleton for non-payment under the purchase order that Singleton submitted to M & T in the amount of $1.5 million ("Singleton/M & T Purchase Order"). In regard to Count I, partial summary judgment will be granted Singleton holding that Singleton has a right of setoff against M & T's right to payment under the contract, but further holding that Singleton's right of setoff is defeated by the IRS's liens. It is unnecessary to determine the exact amount that was owed M & T because it appears that the tax liens will fall well short of equaling the amount that M & T was owed.

Count II alleges breach of contract against F & D for non-payment under the bond. Summary judgment will be granted in favor of F & D on this bond claim to the same extent summary judgment has been granted to Singleton in regard to Count I.

Count III seeks to determine the extent, validity and priority of liens and the respective interests of the defendants in the funds owed to M & T by Singleton and F & D. The motions for summary judgment regarding Count III will be partially granted, determining the rank of priority of the various claims to any funds owed by Singleton to M & T, but not the exact amounts of the claims.

Count IV seeks imposition of a constructive trust to order Capital to disgorge the money it received from Singleton, because those funds are directly traceable to payments Singleton received from Mortenson for the amounts owed by Singleton to M & T. Summary judgment will be granted in favor of Capital dismissing this constructive trust claim.

Count V invokes 11 U.S.C. § 547 to recover as a preferential transfer the money paid to Capital by Singleton. Summary judgment will be granted in Capital's favor dismissing this preference claim.

Count VI alleges a cause of action against Capital and Singleton for wrongful conversion of a check in the amount of $286,080.10 that Singleton made payable to M & T but delivered to Capital. Summary judgment will be granted in favor of Singleton and Capital dismissing this conversion claim.

Count VIII (the count following Count VI)[2] seeks to recover as a preferential

---

1. The motions are: (1) Singleton's Motion for Summary Judgment (Docket Entry ("DE") No. 90); (2) F & D's Motion for Summary Judgment on Count II of Debtor/Plaintiff's Amended Complaint (DE No. 92); (3) F & D's Motion for Summary Judgment on Count VII [misnumbered as Count VIII] of Debtor/Plaintiff's Amended Complaint (DE No. 94); (4) F & D's Motion for Summary Judgment on Co–Defendant Capital's Cross–Claim (DE No. 95); (5) Capital's Motion to Dismiss Amended Complaint or Alternatively, for Summary Judgment (DE No. 96); (6) M & T's Motion for Partial Summary Judgment (DE No. 97); and (7) IRS's Motion for Partial Summary Judgment With Respect to Count III of Amended Complaint (DE No. 98).

2. There is no Count VII of the amended complaint.

transfer an assignment made by M & T to F & D. Summary judgment will be granted in favor of F & D dismissing the preference claim.

Capital's answer to the amended complaint asserts a cross-claim against F & D and Singleton seeking judgment against Singleton pursuant to an oral guarantee and against F & D pursuant to its bond, to the extent that Capital is found to be liable to M & T. In light of the court's decision to grant summary judgment in favor of Capital in regard to Counts IV, V and VI, Capital's cross-claim against Singleton and F & D will be dismissed as moot.

The court now proceeds to a more detailed analysis of the motions.

## II

### A. *FACTUAL BACKGROUND*

On January 17, 1995, M & T filed a voluntary petition under Chapter 11 of the Bankruptcy Code. M & T, as debtor-in-possession, armed with the powers of a trustee under 11 U.S.C. § 1107(a), initiated this adversary proceeding. The background facts pertinent to the motions for summary judgment follow.

On August 6, 1993, Singleton entered into a subcontract with Mortenson for the Dulles Project in the amount of $8,166,000.00. M & T was a minority-owned contractor which qualified as a Disadvantaged Business Enterprise ("DBE") on the Dulles Project. Singleton's subcontract with Mortenson required Singleton to have contracts with DBEs on the Dulles Project qualifying for $3 million of DBE credit. Before the subcontract with Mortenson was signed, Singleton had tentatively agreed with Capital to buy the necessary electrical equipment directly from Capital. The DBE requirement changed that.

On or about September 29, 1993, M & T entered into a purchase order with Singleton to supply electrical equipment and to perform installation work on the Dulles Project in the amount of $1,500,000.00 (the Singleton/M & T Purchase Order). The labor portion of this deal called for M & T to unload the equipment at the Dulles Project site. The equipment portion of this deal was a so-called pass-through arrangement: it was agreed that M & T would contract with Capital for the purchase, and delivery to the Dulles Project, of the equipment called for by the Singleton/M & T Purchase Order. The Singleton/M & T Purchase Order's price included an amount attributable to M & T's marking up by roughly 3% the amount that Capital would charge M & T for supplying the equipment. By passing the equipment through M & T, Singleton would get DBE credit. On or about October 19, 1993, Capital entered into a purchase order with M & T in the amount of $1,435,009.00 ("M & T/Capital Purchase Order") to supply all of the electrical equipment included in the Singleton/M & T Purchase Order. The M & T/Capital Purchase Order included a provision conditioning M & T's obligation to pay Capital on M & T's receiving payment from Singleton.

F & D, a surety company, issued to Singleton a performance and payment bond for the Dulles Project in November 1993. At an even earlier date, F & D and Singleton, to protect F & D, had entered into an indemnity agreement that covers the Dulles Project bond.

In October 1994, Capital began to deliver electrical equipment directly to the Dulles Project and M & T began to perform labor at the site. Capital then began to submit invoices to M & T, who in turn submitted invoices to Singleton, who in turn submitted invoices to Mortenson.

On or about November 30, 1994, Singleton delivered to Capital a check it had made payable to M & T in the amount of $286,080.10. Capital asked M & T to endorse the check to it, but M & T declined to do so. The court examines in part VIII of this decision the facts regarding whether parol evidence establishes that M & T contractually (or as a matter of trust law) had no right to keep amounts, other than its markup, attributable to the equipment Capital had supplied.

On December 19, 1994, the IRS sent notices of levy in the amount of $726,906.95 to Singleton and Capital. Both Singleton and Capital informed the IRS that they were not in possession of any funds owed to M & T.

On December 27, 1994, Capital sent a letter to Singleton and F & D requesting payment of the sum of $1,378,835.72 for electrical equipment delivered to the Dulles Project. (Def.'s Mem.Supp. Summ.J., Ex. A). The letter stated that "[t]his notice is given pursuant to the requirements of the bond . . . ." On January 25, 1995, Capital sent a letter to Singleton and F & D requesting payment of an additional sum of $192,414.82. (Def.'s Mem.Supp.Summ.J., Ex. B). That letter also stated that "[t]his notice is given pursuant to the requirements of the bond . . . ."

Singleton made payments to Capital via check for equipment supplied to the Dulles Project as follows: (1) on December 30, 1994, in the amount of $458,927.29; (2) on January 3, 1995, in the amount of $739,204.11; (3) on January 25, 1995, in the amount of $14,815; (4) on February 15, 1995, in the amount of $152,697.69; (5) on March 24, 1995, in the amount of $23,060.84; and (6) on September 25, 1995, in the amount of $34,976.79.

On January 4, 1995, the IRS sent a second notice of levy in the amount of $726,906.95 to Singleton. In response to the second levy, Singleton forwarded a check to the IRS in the amount of $35,700 by letter dated January 5, 1995. Singleton indicated on the levy acknowledgment that the payment of $35,700 consisted of $33,200 for M & T's 3% markup on the equipment delivered to the Dulles Project as of November 30, 1994, and $2,500 for the labor performed by M & T as of that date.[3]

The IRS asserts that its liens arising from tax assessments against M & T are superior to Singleton's setoff rights. Prior to Singleton making any payment to Capital, the IRS had filed in Washington, D.C. notices of federal tax liens against M & T as follows:

(1) on March 8, 1994, for $72,344.27 for an assessment of October 29, 1993;

(2) on April 15, 1994, for $184,679.86 for an assessment of December 27, 1993;

(3) on November 7, 1994, for $149,538.18 for an assessment of August 8, 1994; and

(4) on November 7, 1994, for $123,179.27 for assessments of August 8, 1994.

The IRS also assessed a tax on December 12, 1994, in the amount of $111,999.47 plus interest and penalties, but filed no notice of tax lien for that assessment. Its proof of claim filed in the bankruptcy case does not assert secured status for the lien that arose from that assessment, apparently in recognition that the lien would be avoidable under 11 U.S.C. § 544, and the IRS's claim would be rendered unsecured. Nev-

---

3. Singleton indicated on the levy acknowledgment that 83% of the equipment had been delivered and 10% of the labor had been performed by M & T as of November 30, 1994.

ertheless, M & T, as a debtor-in-possession, may avoid the lien and preserve it for the estate under 11 U.S.C. §§ 544, 551, and 1107(a), and outside bankruptcy the IRS could assert the lien if the case were to be dismissed. The court will thus address the priority of this lien, as well as the other tax liens, vis a vis Singleton's right of setoff.

Other parties, including F & D, have liens by way of security interests, but as will be seen it is unnecessary to describe those liens in detail.

### B. *SUMMARY OF COURT'S RULINGS*

The court addresses the various counts of the amended complaint seriatim. In parts III through VIII, the court addresses M & T's claim against Singleton for breach of contract (Count I), Singleton's defense of setoff, and the ineffectiveness of that setoff right to defeat the IRS's federal tax liens.[4]

In part III, the court concludes that Singleton was liable to Capital pursuant to the F & D bond (and, alternatively, by Singleton's indemnity agreement with F & D) and that this constituted an independent legal duty to pay Capital, such that Singleton's defense to Count I of a right of setoff is not defeated based on M & T's assertion that Singleton acted as a mere volunteer in paying Capital.

In part IV, the court concludes that a so-called "pay-when-paid" provision in the M & T/Capital Purchase Order does not affect Singleton's obligation to pay Capital pursuant to the F & D bond and the Singleton–F & D indemnity agreement.

In part V, the court further addresses Singleton's setoff defense and concludes in part V(A) that Singleton has a right of setoff unaffected by the "pay-when-paid" provision or by 11 U.S.C. § 553(a)(2), but concludes in part V(B) that the setoff right is defeated to the extent of the federal tax liens.

In Part VI, the court rejects contentions that M & T had no ownership rights in the contract to which the tax liens could attach (unless parol evidence demonstrates otherwise).

In part VII, the court addresses Singleton's defense that it has a superior right to the fund based on subrogation to M & T's rights, and again concludes that any such rights do not suffice to defeat the federal tax liens.

In part VIII, the court addresses Singleton's defenses, based on parol evidence, that it has a contractual defense to payment, and that, alternatively, the equipment portion of each payment included amounts held in trust for Capital (either an express trust or a constructive trust). The court concludes that the parol evidence is insufficient to defeat M & T's right to payment.

The court then turns to the remaining counts.

In part IX, the court concludes with respect to Count II that F & D is protected by Singleton's right of setoff but only to the extent that Singleton itself is protected.

In part X, the court concludes with respect to Count III that some of the tax liens are junior to F & D's liens, but that

---

4. Technically, the issue of the priority of the setoff right vis a vis the tax liens is an issue under Count III (priority of liens and interests), but Singleton's setoff rights, if not defeated by the IRS's liens, would effectively mean the debtor would recover nothing for lien creditors (unless equitable grounds, absent here, warranted declining to recognize the right of setoff). Moreover, a constructive trust defense raised to the tax liens would, if valid, defeat M & T's being owed any amount.

F & D's liens are junior to Singleton's right of setoff, with the IRS entitled to recover to the extent that its liens are senior to F & D, and with Singleton's right of setoff to prevail as to the balance upon which the IRS had tax liens. The exact amounts of the claims will be fixed in further proceedings.

In part XI, the court concludes that Count IV, which is based on an apparent constructive trust theory, should be dismissed because Virginia law did not subject the funds Singleton received from Mortenson to a constructive trust in favor of M & T.

In part XII, the court concludes that Count V, asserting a preference under 11 U.S.C. § 547 with respect to payments Singleton made to Capital, should be dismissed because the payments were not made with property of the estate.

In part XIII, the court determines that Count VI, asserting a conversion claim with respect to the check Singleton delivered to Capital, must be dismissed because Singleton, the payor, never intended M & T, the payee, to have dominion over the check.

In part XIV, the court concludes that the next count, Count VIII, asserting a preference under 11 U.S.C. § 547 against F & D, should be dismissed because M & T has adduced no evidence to establish that F & D was an insider.

In part XV, the court decides to dismiss Capital's cross-claim because of the dismissal of Counts IV, V and VI.

## III

### *SINGLETON'S INDEPENDENT DUTY TO PAY CAPITAL*

■ In Count I, M & T makes a claim against Singleton for amounts owed it for delivering equipment and performing labor for Singleton. Singleton defends, in part, by claiming that it has a right of setoff based on having made payment to Capital, thus becoming subrogated to Capital's claim against M & T. As will be seen, if Singleton made the payment as a mere volunteer, it would have no right of setoff.

Accordingly, an initial question concerns whether Singleton had a legal duty to pay Capital for the equipment it supplied to the Dulles Project, independent of its obligation to pay M & T (who was conditionally liable to Capital).[5] Singleton claims an independent legal duty to pay Capital arising from three separate bases: (1) the payment bond issued by F & D; (2) the terms of Singleton's subcontract with Mortenson; and (3) an oral guaranty that Singleton provided to Capital. The court need only address the first basis for finding an independent duty.

The court finds that the F & D bond protected Capital, and that this in turn gave rise to an independent liability of Singleton to Capital because of Singleton's execution of the bond (and the remedies that arise from it), and that Singleton alternatively acted out of obligation because of Singleton's agreement to indemnify F & D.

### A. *CAPITAL'S PROTECTION BY THE F & D BOND*

At an earlier stage in this proceeding, the court raised the question whether Capital was protected by the F & D payment bond, that is, whether the bond reached down to protect not only M & T but Capital as well. However, at oral argument on the motions for summary judgment the plaintiff's attorney conceded that: (1) the

---

**5.** This is also relevant to the discussion of claim trafficking under 11 U.S.C. § 553 in part V(C), and of M & T's preference claim in part XI.

bond protects all suppliers that delivered materials directly to the job site; and (2) Capital is the one that transported the equipment covered by the Singleton/M & T Purchase Order to the site of the Dulles Project. Tr. at 20–21 (DE No. 124).[6]

■ Accordingly, the court holds that F & D had a duty under the bond to pay Capital if it otherwise was not paid for the equipment it delivered to the Dulles Project. The court notes that a liberal interpretation of payment bonds in favor of unpaid suppliers comports both with the remedial purpose of such bonds and decisions by the Virginia Supreme Court interpreting state statutory provisions that require bonds on public construction projects. *See Solite Masonry Units Corp. v. Piland Constr. Co.*, 217 Va. 727, 232 S.E.2d 759, 761 (Va.1977).

## B. *SINGLETON'S INDEPENDENT LIABILITY TO CAPITAL ARISING FROM HAVING EXECUTED THE F & D BOND*

■ Further, the court holds that Singleton also had an independent legal duty

pursuant to the bond to pay Capital's claim if it otherwise was not paid. By conceding facts demonstrating that the payment bond extended to Capital, M & T necessarily ·has recognized that there existed an obligation on the part of Singleton to see that Capital was paid, as that is the nature of a bond, a form of surety agreement. As between the surety and the surety's principal, the surety is only secondarily liable to the obligee: the surety's principal is the principal obligor liable to the obligee, with the surety obligated to pay only when the obligor fails timely to pay the obligee. *Courson v. Simpson*, 251 Va. 315, 468 S.E.2d 17, 20 (1996).[7]

Here Mortenson was referred to under the bond as the "Obligee." However, Mortenson was only the primary obligee; the bond protected as well, pursuant to a status of third-party beneficiaries, the materialmen who furnished materials in the prosecution of the work provided for in the Mortenson–Singleton contract, which M & T concedes included third-tier subcontractors, such as Capital.[8] *See* Restatement,

---

**6.** Although the IRS did not concede that M & T was correct on this point (Tr. at 43 (DE No. 124)), the existence of Singleton's obligation to Capital only affects whether there was a right of setoff. The issue is an academic point with respect to the IRS's rights because the court concludes that the federal tax liens take priority over Singleton's right of setoff. With respect to the avoidance claims asserted by M & T as a debtor-in-possession clothed with the powers of a trustee, M & T's concession controls.

**7.** The court need not decide whether under the terms of the bond Singleton and F & D are jointly and severally liable to claimants such as Capital at the outset. *See In re Sinicrope*, 21 B.R. 476, 477 (Bankr.W.D.Va.1982) (bond bound principal and surety, jointly and severally, to the owner "for the use and benefit of claimants"). Upon a default in timely payment, they would have both been liable (*see Courson*, 468 S.E.2d at 20; *First Virginia*

*Bank–Colonial v. Baker*, 225 Va. 72, 301 S.E.2d 8, 11 (1983)), subject to the protections accorded the surety by Va.Code Ann. §§ 49–25 and 49–26.

**8.** The condition of the Subcontract Payment Bond (ex. C to Singleton's memorandum (DE 91)) was that "Principal [Singleton] shall pay promptly and in full the claims of all persons performing labor or furnishing materials, supplies and equipment in the prosecution of the work provided for in said Subcontract Agreement ... and shall defend, indemnify and save harmless the Obligee [Mortenson] from any and all such claims...." The bond provided that the bond "shall insure [sic] to the benefit of all persons performing labor, furnishing materials, supplies and equipment in the prosecution of the work provided for in said Subcontract Agreement, as well as to the Obligee [Mortenson], and that such persons may maintain independent actions upon this Bond in their own names."

Third, Suretyship and Guaranty § 69, Comment *b* (materialmen protected by payment bonds are typical context in which a third party can be the beneficiary of the secondary obligation of a surety). Materialmen, such as Capital, were expressly authorized to sue on the bond, which assured that they would be paid by F & D if not otherwise paid. However, F & D's liability was a secondary obligation. In executing the bond, Singleton was necessarily agreeing to assure that third-tier subcontractors such as Capital were paid. If they were not paid by the second-tier subcontractor, it was implicit in the bond that Singleton would pay them.

In other words, the bond embodied two suretyships. First, Singleton implicitly agreed to act as surety for M & T: if M & T defaulted, Singleton was necessarily agreeing in the bond that it would be secondarily liable to Capital. Second, F & D agreed to act as a surety, to be secondarily liable: if M & T defaulted in paying Capital, and Singleton breached Singleton's surety obligation to Capital, then F & D would pay Capital. Singleton, in other words, was a principal surety with respect to Capital and F & D was a subsurety. *See* Restatement, Third, Suretyship and Guaranty § 53(2).

## C. SINGLETON'S INDEPENDENT LIABILITY TO CAPITAL BASED ON REMEDIES UNDER THE F & D BOND

■ The conclusion that the bond establishes that Singleton was independently

liable to Capital, instead of only being liable to M & T who in turn was liable to Capital, can be demonstrated as well by examining the remedies available to F & D under the bond. F & D was entitled to the protection of the equitable principle that a surety has an implied right to reimbursement or restitution. 74 Am.Jur.2d *Suretyship* § 171 (1974); *Southall v. Farish,* 85 Va. 403, 7 S.E. 534, 537 (1888). Moreover, even before having to resort to its right of reimbursement or restitution, a surety has an implied right to performance by its principal of the underlying obligation and may bring suit to compel such performance. *See Wright v. Independence Nat. Bank,* 96 Va. 728, 32 S.E. 459, 460 (1899) (surety may protect himself "by filing his bill quia timet to compel the debtor to pay the creditor, for the surety's exoneration"); *Paxton v. Rich,* 85 Va. 378, 7 S.E. 531, 534 (1888) ("surety on the debts sought to be collected ... is entitled to have the estate of the principal debtor ... first subjected to the payment of those debts ... to the exoneration of his own." (citations omitted)); Restatement, Third, Suretyship and Guaranty § 21.[9] *See also Southall,* 7 S.E. at 537.

## D. SINGLETON'S OBLIGATION TO PAY CAPITAL BASED ON INDEMNITY AGREEMENT WITH F & D

■ F & D was entitled to reimbursement additionally because of an express indemnity contract between Singleton and F & D.[10] And the indemnity agreement

9. *See* in particular Comments *a, i,* and *j* to § 21 of the Restatement and the Reporter's Notes to those Comments. The Restatement draws a distinction between the right to protect the surety's entitlement to performance of the obligation to pay a matured debt (sometimes called exoneration) and *quia timet* relief. The Reporter is of the view that *quia timet* relief is limited to when the debt has not actually matured, being based on a breach of

the duty to refrain from conduct impairing the surety's expectation that the principal will perform. *See also* Mann and Jennings, *Ouia Timet: A Remedy for the Fearful Surety,* 20 Forum 685, 687 (1985) (making same distinction).

10. Agreement of Indemnity (Singleton's Memorandum (DE 91), ex. D), executed in 1987 well before the bond here, but covering it.

was arguably broad enough to expressly grant F & D a right to performance by Singleton of the underlying obligation.[11] Even if F & D's indemnification rights were limited to reimbursement, Singleton could discharge that obligation by making payment directly to Capital, and, in doing so, would not have been acting as a volunteer. Had Singleton waited for F & D to pay Capital, and then indemnified F & D in like amount, Singleton would be subrogated to F & D's rights which would include F & D's having been subrogated to Capital's rights. Singleton's contingent right to assert Capital's rights was merely made noncontingent by Singleton's paying Capital. Even if Singleton had not paid Capital, it would have had a claim, albeit contingent, against M & T based on subrogation to F & D's and hence Capital's rights.

\* \* \* \* \* \*

Having concluded that, pursuant to the F & D bond and the indemnity agreement, Singleton acted out of obligation when it paid Capital, the court finds it unnecessary to determine whether there are any additional bases for concluding that Singleton had an independent legal duty to pay Capital, not just a duty to pay M & T who in turn was liable to Capital.

However, M & T and the IRS contend that F & D and Singleton had no obligation to pay Capital because Capital was only entitled to payment when M & T was paid, and the court turns to that argument next.

## IV

### THE EFFECT ON SINGLETON'S OBLIGATIONS TO CAPITAL OF THE "PAY–WHEN–PAID" PROVISION IN THE M & T/CAPITAL PURCHASE ORDER

The argument that nothing was owed to Capital until M & T was paid concerns the legal effect of the following provision in the M & T/Capital Purchase Order:

> Capitol [sic] Lighting Supply acknowledges that payments to M & T Electric Inc. by Singleton Electric Co. for material on this purchase order is [sic] an express condition precedent to M & T Electric Inc.'s obligation to pay Capitol [sic] Lighting Supply.

Singleton's Mem.Supp.Summ.J., Ex. F (DE No. 91).

M & T and the IRS argue that the "pay-when-paid" provision acts as a condition precedent to M & T's obligation to pay Capital. Singleton responds that "pay-when-paid" provisions do not operate as conditions precedent in construction contracts, but, rather, merely postpone payment for a reasonable time, a position supported by *In re Davidson Lumber*

---

11. Under a liberal interpretation of the term "indemnify," Singleton's obligation "to indemnify and keep indemnified" F & D "from and against any and all liability for losses" (Agreement of Indemnity at p. 1, lines 26–27) was broad enough to require Singleton to pay entities such as Capital to whom F & D would otherwise be liable on the bond. The word "indemnify" means not just reimbursing but also "[t]o save harmless; to secure against loss or damage." Webster's New Int'l Dictionary (2d ed.1959). To keep the surety unharmed, performance by the obligor is a better protection than the right of reimbursement whose realization "obviously involves expense and uncertainty." Restatement, Third, Suretyship and Guaranty, § 21, Comment a. The Agreement of Indemnity expressly required Singleton, upon a default in paying a materialman, to pay F & D even if F & D had not paid the materialman. However, that does not negate the obligation to save F & D harmless by paying the materialman directly; it simply accelerates F & D's right to seek recovery from Singleton that would normally await F & D's paying the materialman.

*Sales, Inc.,* 66 F.3d 1560, 1565 n. 4 (10th Cir.1995).

■ In *Galloway Corp, v. S.B. Ballard Constr. Co.,* 250 Va. 493, 464 S.E.2d 349, 354 (Va.1995), the Supreme Court of Virginia held that in interpreting a "pay-when-paid" provision labeled as a condition precedent "the contract will be construed as written and will not be reformed by the court through the introduction of parol and other extrinsic evidence of a contrary intent." [12] The court cited with apparent approval *Gilbane Bldg. Co. v. Brisk Waterproofing Co.,* 86 Md.App. 21, 585 A.2d 248 (1991), which held that the use of the term "condition precedent" in a "pay-when-paid" provision clearly evidences the parties' intent to shift the risk of default by the owner from the general contractor to the subcontractor. *Galloway,* 464 S.E.2d at 354. In light of *Galloway,* the court holds that the "pay-when-paid" provision establishes a condition precedent to M & T's obligation to pay Capital.

■ However, the "pay-when-paid" provision in the Purchase Order does not affect Singleton and F & D's legal duty to pay Capital pursuant to the bond. As noted in *Moore Brothers Co. v. Brown & Root, Inc.,* 207 F.3d 717, 723 (4th Cir. 2000), the Supreme Court of Virginia has not considered the question whether a surety can assert as a defense to a claim a "pay-when-paid" provision in a subcontract. However, the court will follow the decision in *Moore* that a surety cannot rely upon a "pay-when-paid" clause in a subcontract unless the bond explicitly gives the surety the right to rely upon the defenses provided in that subcontract. To hold otherwise would run counter to the purpose of the bond. *See Moore,* 207 F.3d at 723–24. Based on Singleton's obli-

gations arising under the F & D bond, and under the indemnification agreement with F & D, as discussed in part III, above, it follows that Capital was entitled to immediate payment from Singleton. In turn, having paid Capital, Singleton is entitled to look to M & T for repayment, for the reasons discussed in part V(A), below.

## V

### SINGLETON'S RIGHT OF SETOFF

Count I of the amended complaint alleges breach of contract against Singleton for non-payment pursuant to the Singleton/M & T Purchase Order. M & T seeks to recover from Singleton $1,464,300, which represents the total dollar amount stated on the Purchase Order ($1,500,000) less the $35,700 paid by Singleton to the IRS on behalf of M & T.

M & T moves for summary judgment on Count I on the basis that it has substantially performed its obligations under the Purchase Order. Singleton has requested summary judgment claiming that even if it owes M & T any additional money, which it denies, it has a right of setoff against all such sums sufficient to defeat any federal tax lien. The court rejects that argument.

### A. SINGLETON HAD A RIGHT OF SETOFF

No party has disputed the fact that Singleton made payments to Capital totaling $1,423,681.72 for equipment covered by the M & T/Capital Purchase Order (and the Singleton/M & T Purchase Order). Singleton claims, as a matter of law that it has a right to set off those payments against

---

12. Accordingly, the question of the proper interpretation of the "pay-when-paid" provision in the Purchase Order is a question of law. *See also Statesville Roofing & Heating Co. v. Duncan,* 702 F.Supp. 118 (W.D.N.C. 1988).

any sums it may owe M & T. The court concludes that:

(1) Singleton has such a right through restitution and subrogation to Capital's claims against M & T;

(2) the "pay-when-paid" provision in the M & T/Capital Purchase Order does not preclude Singleton's right of setoff; and

(3) 11 U.S.C. § 553(a)(2) does not bar the right of setoff.

### 1. Setoff Based on Singleton's Rights to Restitution and Subrogation

■ The Bankruptcy Code preserves a creditor's right of setoff that arose under applicable nonbankruptcy law prior to the filing of the petition. Section 553(a) of the Bankruptcy Code provides in pertinent part as follows:

[T]his title does not affect any right of a creditor to offset a mutual debt owing by such creditor to the debtor that arose before the commencement of the case under this title against a claim of such creditor against the debtor that arose before the commencement of the case. . . .

11 U.S.C. § 553(a). However, despite Singleton's claims to the contrary, it is clear from the language of Section 553 that it does not create any substantive rights of setoff, but, rather, only ensures the surviv-al of rights otherwise existing. *See Citizens Bank of Maryland v. Strumpf,* 516 U.S. 16, 18, 116 S.Ct. 286, 133 L.Ed.2d 258 (1995). Accordingly, the court first must determine whether Singleton has a right of setoff against M & T under Virginia law. Specifically, does Singleton have a claim against M & T that it may assert by way of setoff? Singleton does have claims against M & T based on a right to restitution (even if it had no right of subrogation to Capital's rights) and also based on subrogation. In turn, Virginia law gives Singleton the right to assert setoff of that claim against Singleton's own obligation to M & T.

■ Singleton's secondary obligation to Capital, pursuant to Singleton's suretyship under the F & D bond and pursuant to Singleton's indemnification agreement with F & D, entitles Singleton to a claim against M & T for at least restitution (if not for the more expansive remedy of reimbursement)[13] because a secondary obligor who pays a principal's debt is entitled to recover, based on restitution, to the extent that the principal obligor would be unjustly enriched. Restatement, Third, Suretyship and Guaranty § 26. This remedy is available even when the secondary obligor is not entitled to subrogation to the rights of the obligee.[14] Based on the Virginia cases concerning subrogation that are discussed be-

---

**13.** If M & T was charged with notice of the secondary obligation, Singleton would be entitled to the remedy of reimbursement. Restatement, Third, Suretyship and Guaranty, § 22. There is no right to "reimbursement" for a secondary obligor's reasonable outlay—based on implied contract—when the principal obligor is not charged with notice of the secondary obligation. The record does not establish whether M & T, as principal obligor, should be charged with notice of Singleton's secondary obligation to Capital pursuant to the F & D bond. For example, a principal obligor is charged with notice of the secondary obligation if the principal obligor knew of the secondary obligation when it entered into the underlying obligation. Restatement, Third, Suretyship and Guaranty § 20.

**14.** *See* Restatement, Suretyship and Guaranty § 27 (even when the secondary obligor is not entitled to subrogation because the secondary obligation covers only part of the underlying obligation, nevertheless "the principal [sic—should be secondary] obligor will be entitled to either reimbursement (§ 22) or restitution (§ 26)" (remedies of the secondary obligor against the principal obligor)).

low, it is evident that, in order to avoid unjust enrichment, Virginia would allow the remedy of restitution short of subrogation when the secondary obligor is not fully entitled to be subrogated to the rights of the obligee. In any event, the right of subrogation applies in this case.

 The right of subrogation is an equitable doctrine that is liberally applied in Virginia. *See Gill v. Rollins Protective Services Co.,* 773 F.2d 592, 598 (4th Cir. 1985) ("the right of subrogation has long been generally favored in Virginia"), *modified in other respects,* 788 F.2d 1042 (4th Cir.1986); *Federal Land Bank of Baltimore v. Joynes,* 179 Va. 394, 18 S.E.2d 917, 920 (1942) ("[t]his doctrine [subrogation] is not dependent upon contract, nor upon privity between the parties; it is the creature of equity, and is founded upon principles of natural justice"). As observed in *In re Valley Vue Joint Venture,* 123 B.R. 199, 208–09 (Bankr.E.D.Va.1991), a case applying the Virginia law of subrogation:

> The purpose of subrogation is to prevent the unearned enrichment of one party at the expense of another.... Subrogation "is a device adopted or invented by equity to compel the ultimate discharge of a debt or obligation by him who in good conscience ought to pay it." ... "Virginia is committed to a liberal application of the principle."

[Citations omitted.]

A weighing of the equities in this case supports Singleton's right to be subrogated to Capital's claims against M & T. To hold otherwise would require Singleton to pay twice for the equipment supplied by Capital without providing it with a means of recovering the excess payments; and it would allow either Capital (by being able to request payment from M & T as well) or M & T (by having its debt to Capital extinguished) to receive an unjust windfall.

Singleton did not act as a volunteer who ought not be entitled to subrogation. In light of Virginia courts' liberal view of subrogation, the term "volunteer" would presumably be given a narrow and strict construction. *See* 73 Am.Jur.2d Subrogation § 24 n. 71. The term "volunteer" has been defined as follows:

> Parties may be considered volunteers if, in making a payment, they have no interest of their own to protect, they act without any obligation, legal or moral, and they act without being requested to do so by the person liable on the original obligation. *Henningsen v. United States Fidelity & Guar. Co.,* 208 U.S. 404, 411, 28 S.Ct. 389, 391–92, 52 L.Ed. 547 (1908); *Smith v. State Sav. & Loan Ass'n,* 175 Cal.App.3d 1092, 1098, 223 Cal.Rptr. 298, 301 (1985); *Norfolk & Dedham Fire Ins. Co. v. Aetna Casualty & Surety Co.,* 132 Vt. 341, 344, 318 A.2d 659, 661 (1974).

*Mort v. United States,* 86 F.3d 890, 894 (9th Cir.1996). Under this definition of "volunteer," Singleton was not a volunteer for at least two reasons.

First, the F & D payment bond protected Capital. Even if Singleton had no direct contract with Capital guaranteeing payment of its claim, Singleton was obligated as principal on the F & D payment bond and the indemnity agreement with F & D to protect F & D from unpaid claims of Capital (and to reimburse F & D if F & D ever paid the Capital claim). Accordingly, Singleton acted with obligation. It was no officious intermeddler having only volunteer status.[15]

---

**15.** M & T and the IRS contend that Capital never made a demand on M & T for payment, and that, accordingly, M & T was never in default. But Capital surmised correctly that M & T was unable to make payment. Because M & T was unable to perform, Capital was

That Singleton was arguably under no obligation to M & T to secure a payment bond protecting Capital is of no moment. In *Dickenson v. Charles*, 4 S.E.2d 351, 173 Va. 393 (1939), Charles, the president of a bank, personally endorsed certificates of deposits that had been issued by the bank. The court held that in insolvency proceedings of the bank Charles could set off his claims against the bank for reimbursement against the bank's judgments against him. Although the court spoke of the implied right to reimbursement or indemnity, it considered without distinction case law supporting a surety's right to set off subrogated claims. The president, like a surety, could set off payments he was obligated to make, on behalf of the bank, after the insolvency of the bank, because those payments related back to the date of the original endorsement agreements.

Furthermore, the court addressed the argument that the setoff should be disallowed because the bank had not requested the president's endorsement and, therefore, he was a mere volunteer. The court responded that the endorsement was done for the benefit of the bank, the bank was aware of the endorsement and "in effect ratified it." *Dickenson*, 4 S.E.2d at 356. However, the court also quoted with approval from *Scott v. Norton Hardware Co.*, 54 F.2d 1047, 1051 (4th Cir.1932), as follows:

> Certainly a guarantor who is held to liability under a bond which he has executed is not a volunteer in any sense in which that term has ever been used in

the law. The fact that appellants were under no legal obligation to sign the bond in the first place is, of course, immaterial. A surety is not to be denied reimbursement or subrogation because he signed for accommodation rather than for profit. On the contrary, the accommodation surety has always been one of the favorites of the law.

*Dickenson v. Charles*, 4 S.E.2d at 356.

Had F & D performed as secondary obligor under the bond, subrogation would have applied even if M & T did not know of the bond (Restatement, Third, Suretyship and Guaranty § 27, Comment *e*) and even if Capital did not know of its protection under the bond (*id.*, § 27, Comment *g*). Singleton's rights in making payment under the bond ought not be any lower than F & D's, unless it could be shown that it executed the payment bond as a ruse to avoid the strictures of the rule against a volunteer, an officious intermeddler, being entitled to subrogation. The record does not support any possible finding of such a ruse: the payment bond was executed in November 1993 and Capital did not begin to deliver electrical equipment until October 1994.

Second, Singleton faced a potential claim by Capital that the Virginia mechanics' and materialmen's lien statute protected it. The statute is unclear on the point and the parties have cited no case law holding a supplier of a sub-subcontractor is not entitled to the protection of those statutes.[16]

---

entitled to look to the bond for payment. The court will not require what would have been a useless minuet of Capital demanding payment from M & T. As will be seen, the "pay-when-paid" provision in the M & T/Capital Purchase Order does not alter this analysis.

**16.** Under Va.Code Ann. § 43–3(A) "[a]ll persons ... furnishing materials ... of the value of fifty dollars or more, for the construction

... of any building ... shall have a lien, if perfected as hereinafter provided, upon such building...." However, perfection of a lien is limited to the general contractor (§ 43–4), subcontractors (§ 43–7) and persons "performing labor or furnishing materials for a subcontractor...." The term "subcontractor" is defined in § 43–1, as relevant here, as including "persons furnishing materials, who do not contract with the owner but with the

However, Singleton was obligated under its contract with Mortenson to assure that there were no materialmen liens on the property being improved.[17] Thus, in paying Capital Singleton was removing any potential claim by Capital for which Singleton would be responsible if the ambiguity in the statute were resolved in favor of Capital. "One who settles under threat of civil proceedings or to protect its own interests is not a mere volunteer." *Rowley Plastering Co., Inc. v. Marvin Gardens Develop. Corp.*, 180 Ariz. 212, 214, 883 P.2d 449, 451 (Ariz.Ct.App.1994) (citations omitted).

Accordingly, Singleton has a claim against M & T based on having paid Capital for materials Capital supplied to M & T. In turn, that gives rise to a right of setoff because Virginia recognizes that a surety is entitled to set off the amount the surety, as secondary obligor, pays an obligee against the surety's debt to the principal obligor. *Dickenson*, 4 S.E.2d at 353–54. In light of the foregoing, the court concludes that under Virginia law Singleton has a right of setoff in this case through subrogation to Capital's claim against M & T.

Before addressing in part V(B), below, the priority of this setoff right as against the federal tax liens, the court next addresses whether the right of setoff is defeated by the "pay-when-paid" provision in the M & T/Capital Purchase Order (part 2, below) or 11 U.S.C. § 553(a)(2) (part 3, below).

2. *Effect of the "Pay–When–Paid" Provision on Setoff Rights*

M & T and the IRS argue that the "pay-when-paid" provision in the M & T/Capital Purchase Order defeats Singleton's alleged right of setoff against M & T. As discussed above, the "pay-when-paid" provision acts as a condition precedent to M & T's liability to Capital, but does not affect Singleton and F & D's obligations to Capital pursuant to the bond.

The purpose of the "pay-when-paid" provision is to shift the risk of default from M & T to Capital. *See Galloway*, 464 S.E.2d at 354. Accordingly, there is some appeal to M & T's argument that Singleton could not set off M & T's conditional debt to Capital against a separate unconditional liability of Singleton to M & T. The allowance of such a setoff would in effect transform a conditional liability into an unconditional one. However, setoff should be allowed if it does not shift the risk of default to M & T. The critical question is whether setoff requires M & T to deplete its resources before having received payment from Singleton.

Here, Singleton seeks to effect collection from M & T of the amount that M & T

---

general contractor." (And the term "general contractor" is defined as a contractor who contracts directly with the owner.) It is unclear whether a third-tier subcontractor like Capital who was the subcontractor of M & T, a sub-subcontractor, could be viewed as "furnishing materials for a subcontractor," specifically, for Singleton so as to be entitled to file a lien.

**17.** The Singleton–Mortenson subcontract (F & D's Memorandum (DE 93) ex. 1), in § 7.8, "conditioned final payment to Singleton on its furnishing evidence that there are no claims,

obligations, or liens for ... materials ... furnished ... in connection with the Work." In § 7.10, Singleton agreed that:

> Subcontractor shall pay promptly for all materials ... used in performance of this Subcontract, as bills or claims become due. Subcontractor shall protect the Project and defend, indemnify and hold harmless Owner and Mortenson and Mortenson's surety, if any, from and against all claims, bond claims, equitable liens, mechanics' liens, damages, losses and expenses on account thereof....

conditionally owed Singleton (as Capital's subrogee) via setoff at the instant that Singleton pays its obligation to M & T, and, thereby, makes its subrogated claim against M & T unconditional. The "pay-when-paid" condition is unavailable to M & T as a defense because Singleton is treating M & T as paid by Singleton at the instant Singleton effects setoff. Although M & T is not actually receiving payment from Singleton, that is precisely the point of setoff.

Singleton's right of subrogation is designed to avoid unjust enrichment. This thus counsels in favor of allowing Singleton to exercise setoff by placing on the setoff table, with one hand, the payment owed M & T (thus triggering satisfaction of the "pay-when-paid" condition to Capital's claim) while simultaneously sweeping back, with the other hand, the payment now owed to Singleton as Capital's subrogee, thereby leaving a zero sum on the setoff table. Even without a right of subrogation, Singleton's right to restitution would entitle it to payment from M & T via setoff in order to avoid unjust enrichment: it would be unjust for M & T to receive payment from Singleton when Singleton had already paid a sum that, in the absence of Singleton's having paid Capital, would, upon the payment from Singleton, be owed Capital.

Therefore, the court holds that the "pay-when-paid" provision does not affect Singleton's right of setoff, because M & T's liability under the M & T/Capital Purchase Order will not be conditional at the moment of setoff.

### 3. The Effect of 11 U.S.C. § 553(a)(2)

■■■ M & T and the IRS assert that if Singleton has any subrogated claims against M & T they are excepted from setoff by 11 U.S.C. § 553(a)(2). Section 553(a)(2) excepts from setoff a claim transferred to a creditor after the commencement of the case or after 90 days before the date of the filing of the petition while the debtor was insolvent.[18] 11 U.S.C. § 553(a)(2). They contend that any subrogated claims were transferred to Singleton upon payment to Capital; and it is undisputed that all of Singleton's payments to Capital were made either after the commencement of the case or after 90 days before the commencement of the case.

In *In re Flanagan Bros., Inc.*, 47 B.R. 299 (Bankr.D.N.J.1985), a contractor was obligated pursuant to a bond to pay the claim of its subcontractor's unpaid supplier. The court concluded that a claim is not transferred within the meaning of § 553(a)(2) when it is acquired pursuant to a direct legal obligation. *Id.* at 303. *Accord, In re Jones Truck Lines, Inc.*, 196 B.R. 123, 127 (Bankr.W.D.Ark.1996); *In re Corland Corp.*, 967 F.2d 1069, 1078 (5th Cir.1992). Accordingly, the court held that if the contractor paid the supplier, state law and § 553 would allow it to set off that amount against its indebtedness to the subcontractor's bankruptcy estate. *Flanagan*, 47 B.R. at 303. *See also In re E & D Elec. Co.*, 68 B.R. 3 (Bankr. S.D.Miss.1986) (contractor can set off against bankruptcy estate of subcontractor any post-petition payments it makes to subcontractor's unpaid suppliers pursuant to a surety bond).

■■■ The court in *Flanagan* reasoned that the purpose behind § 553(a)(2) was to prohibit trafficking in claims in order to acquire a setoff against a bankruptcy estate. If not for § 553(a), a creditor of the estate might sell its claim at a discount to a party liable to the estate for a prepeti-

---

**18.** For purposes of Section 553, the debtor is presumed to be insolvent on and during the 90 days immediately preceding the date of the filing of the petition. 11 U.S.C. § 553(c).

tion debt. However, when postpetition payments are made pursuant to a direct legal obligation entered into prepetition such claim trafficking is not at issue. *Flanagan,* 47 B.R. at 303. *See also Jones,* 196 B.R. at 127.

The court was also concerned that it would be inequitable to require a contractor to pay twice (once to the subcontractor and once to its suppliers) while providing the subcontractor with a windfall (receiving payment from contractor and having liability to suppliers extinguished). *Flanagan,* 47 B.R. at 303. *See also Jones,* 196 B.R. at 127–28; *E & D Elec. Co.,* 68 B.R. at 4.

M & T and the IRS argue that these decisions are contrary to the plain language of § 553(a). Although the court would hesitate to rely upon arguments of equity and legislative intent that run counter to the plain language of the statute, here the court finds no such conflict.

Capital had a prepetition claim against M & T, and Singleton had a contingent liability to Capital upon issuance of the F & D bond. Accordingly, Singleton had a prepetition contingent claim against M & T in the event it paid Capital pursuant to the bond. Section 101(5)(A) of the Bank-

ruptcy Code defines the term claim to include a "right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured." 11 U.S.C. § 101(5)(A). In light of this expansive definition, the court does not believe that the claim Singleton seeks to set off against M & T is "transferred" within the meaning of 11 U.S.C. § 553(a)(2). *See Jones,* 196 B.R. at 127; *Corland,* 967 F.2d at 1078.[19]

Accordingly, the court holds that Singleton has a right of setoff against M & T for all amounts it paid to Capital for equipment covered by the Singleton/M & T Purchase Order.[20] The court, however, must still determine the relative priority between Singleton's right of setoff and the IRS tax lien.[21]

### B. *THE PRIORITY OF THE FEDERAL TAX LIENS OVER SINGLETON'S SETOFF RIGHTS*

Section 6321 of the Internal Revenue Code provides in pertinent part:

If any person liable to pay any tax neglects or refuses to pay the same after demand, the amount ... shall be a lien

---

**19.** As the courts in *Corland* and *Jones* point out, Section 509(a) of the Bankruptcy Code specifically authorizes subrogation. 11 U.S.C. § 509(a). *See Jones,* 196 B.R. at 127 ("[p]ostpetition payments on a guaranty entered into prepetition are eligible for setoff and are the exact type of payments contemplated by section 509(a)"); *Corland,* 967 F.2d at 1078.

**20.** Although Singleton has a right of setoff effective against M & T (subject to whatever lien rights, if any, are held by the IRS and the other defendants (see Count III)), because Singleton did not exercise setoff prior to the filing of the bankruptcy petition, it must move for relief from the automatic stay pursuant to 11 U.S.C. § 362(d) in order to effect setoff.

**21.** Singleton takes the position that the court has to decide the enforceability of the IRS levy if it is to determine the priority of the IRS tax liens. Singleton's Supplemental Mem. (DE No. 122) at p. 4. The court can properly address the issue of lien priority between the IRS and Singleton without deciding the question of enforcement of the IRS levy. In contrast to a lien enforcement proceeding, a levy is a provisional remedy for collection of taxes that does not determine who has a superior right in the property seized. *See United States v. National Bank of Commerce,* 472 U.S. 713, 721, 105 S.Ct. 2919, 86 L.Ed.2d 565 (1985). Accordingly, it was entirely appropriate for the IRS to object to discovery regarding its levies, which it does not seek to enforce in this court.

in favor of the United States upon all property and rights to property, whether real or personal, belonging to such person.

26 U.S.C. § 6321. This language "is broad and reveals on its face that Congress meant to reach every interest in property that a taxpayer might have." *National Bank of Commerce*, 472 U.S. at 719–20, 105 S.Ct. 2919 (citation omitted).

1. *With Respect to the Question of Priority, Singleton Did Not Have a Security Interest Such as to be Entitled to Invoke 26 U.S.C. § 6323 in Place of the Generally Harsher Choateness Rule*

■■■■ Absent a statutory provision according a lien priority over a federal tax lien, the priority of a federal tax lien vis-a-vis another lien is governed by the common law principle that first in time is first in right. *United States v. McDermott*, 507 U.S. 447, 449, 113 S.Ct. 1526, 123 L.Ed.2d 128 (1993). A federal tax lien attaches to property at the moment the tax assessment is made. 26 U.S.C. § 6322. The choateness doctrine will not prevent a competing creditor from defeating a federal tax lien if that creditor's interest is entitled to priority under 26 U.S.C. § 6323.

The court first examines whether Singleton comes within one of the statutory exceptions for "security interests," and concludes that Singleton had no "security interest." The court will then turn to the generally harsher choateness doctrine, and will conclude that Singleton's right of setoff did not become choate before the tax liens attached to M & T's right to payment from Singleton.

Under 26 U.S.C. § 6323(a), a tax lien "shall not be valid as against any … holder of a security interest … until notice thereof … has been filed…." Under 26 U.S.C. §§ 6323(c) and 6323(d), certain security interests enjoy more favorable priority rules than the general rule of § 6323(a). Under 26 U.S.C. § 6321(h)(1):

The term "security interest" means any interest in property acquired by contract for the purpose of securing payment or performance of an obligation or indemnifying against loss or liability. A security interest exists at any time (A) if, at such time, the property is in existence and the interest has become protected under local law against a subsequent judgment lien arising out of an unsecured obligation, and (B) to the extent that, at such time, the holder has parted with money or money's worth.

If Singleton's setoff rights were an "interest in property acquired by contract" within the meaning of 26 U.S.C. § 6323(h)(1), then the court would not need to resort to more stringent choateness doctrines to determine whether Singleton's setoff rights are superior to the federal tax liens.

■■■■ Although a right of setoff is normally not understood as a security interest, *United States v. BCCI Holdings (Luxembourg), S.A.*, 941 F.Supp. 180, 186 (D.D.C.1996), when the right of setoff arises from contract it falls within the definition of a security interest in 26 U.S.C. § 6323(h)(1) for purposes of Section 6323(a). *Jersey State Bank v. United States*, 926 F.2d 621, 623 (7th Cir.1991); *In re Bay State York Co., Inc.*, 162 B.R. 922, 932–34 (Bankr.D.Mass.1993). *But see United States v. Sterling Nat'l Bank & Trust Co. of New York*, 360 F.Supp. 917, 924 (S.D.N.Y.1973), *aff'd in part & rev'd in part on other grounds*, 494 F.2d 919 (2d Cir.1974) (suggesting that only security interests under article 9 of the Uniform Commercial Code are security interests for purposes of § 6323(a)).

■■■■ Virginia law makes clear that the right of setoff here did not arise from

contract. In *Dickenson v. Charles*, 4 S.E.2d at 353, quoting *Kendrick v. Forney*, 63 Va. (22 Gratt.) 748, 749, 750, the court made clear that under Virginia law equitable subrogation does not arise from contract:

> There is an implied contract of indemnity between the principal and his surety, which obliges the former to reimburse the latter who has paid his debt; and the courts of equity will substitute him to the remedies and securities of the creditor for his indemnity; and *this not upon the ground of contract, but upon a principle of natural justice.*

[Emphasis added.] In addition, Singleton has not pointed to a contract with M & T whereby Singleton agreed to be M & T's surety, such that Singleton's remedies of surety (including the right of indemnification) could be treated as an implicit term of a contract with M & T as principal obligor. Instead, Singleton's obligations of suretyship arose from a contract with F & D, and there was no implicit contract for M & T to indemnify Singleton.

Accordingly, Singleton's rights of setoff were not "acquired by contract" as required by 26 U.S.C. § 6323(h)(1). Singleton can point to no contract by which Singleton acquired a right of setoff. Singleton took on an obligation to act as a surety for Capital when it entered into the bond contract and indemnity contract with F & D, but by those contracts, Singleton did not acquire a right of setoff against the amounts it owed M & T. Instead, Singleton's right of setoff against the amount it owed M & T arose purely as an equitable remedy. Upon paying Capital as it was obligated to do under its contracts with F & D, Singleton acquired a right to assert a claim against M & T based on either restitution or by way of subrogation to Capital's rights. Both of these claims arise as equitable remedies, not as rights acquired

by contract. Simultaneously with acquiring those claims against M & T, Singleton obtained by way of equity a right to set off the claims against the amounts it owed M & T.

In *Bay State*, 162 B.R. at 932–34, the court used language which could be read out of context as supporting the proposition that Singleton should be deemed to have a security interest. In *Bay State*, the court dealt with a surety, Hartford, which had issued a payment and performance bond to a subcontractor, BSY, on a construction project, and had obtained an indemnification agreement from BSY. When Hartford had to complete BSY's performance and pay one of BSY's suppliers, Hartford sought to enforce its claim for reimbursement against the retainage amounts owed BSY and held by the prime contractor. The IRS asserted liens for taxes owed by BSY. The bond contract and indemnity agreement were directly with the principal obligor, BSY, not with some third party, and BSY agreed that Hartford as surety would be entitled to recover the proceeds. The indemnity agreement assigned to the surety, Hartford, all rights of the taxpayer in its subcontract with the prime contractor, 162 B.R. at 926, and provided that

> the entire contract price shall be dedicated to the satisfaction of the conditions of the bonded ... [illegible] ..., plus any proceeds thereof, given under the bonded contract shall be impressed with a trust in the hands of the Indemnitors [BSY] in favor of the Surety for the purpose of satisfying the conditions of the bonded contract and shall be used for no other purpose until such conditions have been fully satisfied.

162 B.R. at 927. Although Hartford apparently could not defeat the IRS based on simply a contractual right to the funds, *Bay State*, 162 B.R. at 931, the indemnity

agreement provided that the surety was to be entitled to look to the amounts owed BSY for reimbursement: this was an agreement to be secured by the contract proceeds. The court in *Bay State* seems to have reasoned that equitable subrogation merely provided the vehicle for insuring that this security arrangement would be perfected under local law against a judgment lien creditor and hence would qualify as a "security interest" having priority over the IRS lien.

The IRS argued that Hartford's right to the retainage amounts was not a right acquired by contract, but instead a right arising from the right of equitable subrogation. The court viewed the IRS's position as "overly technical and contrary to its own regulations." *Bay State*, 162 B.R. at 933. It observed that "[a]lthough subrogation rights are not created by contract, . . . they may be acquired by contract," and read 26 C.F.R. § 301.6323(c)–3(d)(3) (1993) as consistent with its view that Hartford had acquired its right by contract. *Bay State*, 162 B.R. at 934.

This court respectfully disagrees with the *Bay State* court's interpretation of the regulation. That regulation sets forth an example which posits that "the agreement [with the taxpayer K] provides that S [the surety] is to have a security interest in all property belonging to K" and "[u]nder local law S's security interest in the proceeds of the contract and S's security interest in the property of K are entitled to priority over a judgment lien arising December 1, 1971 (the date of tax lien filing) out of an unsecured obligation." So § 301.6323(c)–3(d)(3) could not be clearer that the security interest was created by the contract (and hence that the security interest was "acquired by contract").

The court in *Bay State* may have reasoned that because a security agreement existed and the security interest was perfected by local law (through the vehicle of subrogation) against subsequent judgment lien creditors, the case came within the regulation. There is a fallacy in such reasoning because it was subrogation operating alone that gave Hartford a perfected position against judgment lien creditors, with the security interest remaining unperfected under Massachusetts' version of the Uniform Commercial Code: subrogation did not perfect the security interest; rather, subrogation operated by itself to give Hartford a perfected claim against the property. As recognized by 26 U.S.C. § 6323(i)(2), an entity may be subrogated under local law to the rights of another with respect to a lien or interest, and upon such subrogation is entitled to assert those rights against a tax lien. The rights Hartford asserted via subrogation were the interests of the owner and of BSY's materialmen and workers in the retained fund, not its own security interest. Although Hartford might have been subrogated to whatever security interest the owner and the materialmen and workers had (*see* 26 C.F.R. § 6323(i)–1(b)(2) (example 2)), it was most assuredly not subrogated to its own unperfected security interest: subrogation by definition is succeeding to the rights of another, not to your own rights.

Even if *Bay State* were correctly decided, it could not be extended to a case in which the taxpayer never entered into a contract with the surety for the surety to have a security interest in the proceeds owed the taxpayer on a subcontract. The court thus concludes that Singleton had no security interest as defined by § 6323(h)(1).[22]

---

**22.** The court will not address the academic question of whether Singleton, had it had a

security interest, could take priority under 26 U.S.C. §§ 6323(a) (general provision for when

## 2. Priority Under the Choateness Rule of the Federal Tax Liens Over Singleton's Setoff Rights

 The statutory priority rules contained in 26 U.S.C. § 6323 have a "purpose . . . 'of protect[ing] third persons against harsh application of the federal tax lien.'" *See McDermott*, 507 U.S. at 461, 113 S.Ct. 1526 (dissenting opinion) (citation omitted). It is not surprising that Singleton cannot take priority under the non-statutory doctrine of choateness.

 Under the federal common law of choateness, a state-created lien is deemed to be in existence for "first in time" purposes when it is "perfected" or "choate"; that is, when the "'identity of the lienor, the property subject to the lien, and the amount of the lien are established.'" *McDermott*, 507 U.S. at 449, 113 S.Ct. 1526 (citations omitted). *See also United States v. Central Bank*, 843 F.2d 1300, 1307 (10th Cir.1988). Choate liens take priority over later filed federal tax liens, while inchoate liens do not. *Horton Dairy, Inc. v. United States*, 986 F.2d 286, 291 (8th Cir.1993) (citations omitted). While the choateness doctrine is irrelevant when 26 U.S.C. § 6323 accords a lien priority over a federal tax lien, the doctrine of choateness nevertheless still applies when § 6323 is silent regarding priority. *See, e.g. Burrus v. Oklahoma Tax Commission*, 59 F.3d 147 (10th Cir.1995) (giving state tax lien priority under choateness doctrine).[23] Because 26 U.S.C. § 6323 does not address the priority of rights of setoff arising other than by contract, the choateness doctrine must be brought to bear to decide whether a right of setoff arising based on equitable principles should be accorded priority over a federal tax lien.

 A non-contractual right of setoff is not exempt from the federal requirement of choateness. *See Central Bank*, 843 F.2d at 1310 (in order for a bank's right of setoff against a taxpayer's account to be choate three steps are necessary: (1) the decision to exercise the right; (2) some action that accomplishes the setoff; and (3) some record that evidences the exercise of the right); *Horton Dairy*, 986 F.2d at 291 ("[a]n unexercised right of setoff cannot defeat a government tax lien"); *United States v. Bank of Celina*, 721 F.2d 163 (6th Cir.1983); *Peoples Nat'l Bank v. United States*, 777 F.2d 459 (9th Cir.1985); *United States v. Cache Valley Bank*, 866 F.2d 1242 (10th Cir.1989). *See also J.A. Wynne Co., Inc. v. R.D. Phillips Constr. Co.*, 641 F.2d 205 (5th Cir.1981) (federal tax levy defeats contractor where there was no evidence contractor exercised contractual right to withhold progress payments from taxpayer before receiving levy); *BCCI Holdings*, 941 F.Supp. at 180 (right of setoff is not self-executing). *But see Pittsburgh Nat'l Bank v. United States*, 657 F.2d 36 (3d Cir.1981) (taxpayer did not have property interest in bank account to which tax levy could seize where state law effected an "automatic setoff" that extinguished taxpayer's interest in account).

Most of the above-cited cases concern a bank's right of setoff against a taxpayer's bank account. Should progress payments

security interest takes priority), 6323(c)(4)(B) (special rule for obligatory disbursement agreements), 6323(c)(4)(C) (special rule for surety), 6323(d) (45–day period for making disbursements), and 6323(h)(1) (defining when a security interest is in existence), as interpreted in 26 C.F.R. §§ 301.6323(c)–3(c), 301.6323(d)–l(b) (example 2), 301.6323(h)–

1(a)(1) (property in existence), 301.6323(h)–1(a)(2) (protection against subsequent judgment lien), and 301.6323(h)–1(a)(3) (money or money's worth).

**23.** Not at issue is whether choateness has a role in interpreting how 26 U.S.C. § 6323 itself ought to be applied.

be treated differently than bank accounts for determining when a right of setoff is choate? Unlike progress payments, the taxpayer generally has free access to his bank account until setoff is formally exercised. *But see Texas Commerce Bank–Hurst, N.A. v. United States*, 703 F.Supp. 592 (N.D.Tex.1988) (right of setoff is inchoate even though bank put administrative hold on taxpayer's account).

■ For purposes of analysis, the court will disregard the rule of choateness in the context of bank setoff that requires exercise of the right of setoff to make it choate. Under the general rule of choateness, Singleton's right of setoff did not become choate until after the IRS tax liens had arisen. Capital did not make a formal demand for payment from Singleton and F & D until December 27, 1994, after the tax liens had arisen. Singleton did not make its first payment to Capital until December 30, 1994.

As discussed above, a security interest is inchoate until the identity of the lienor, the property subject to the lien, and the amount of the lien are established. At a minimum, Singleton's right of setoff was inchoate until Capital demanded payment from Singleton and F & D. Moreover, until Singleton paid Capital, the amount of the setoff was not established. Indeed, as late as November 30, 1994, Singleton was delivering a check to Capital made payable to M & T which Capital then asked M & T to endorse to Capital. So Singleton's own conduct shows that it had not yet chosen to treat setoff as already in existence.

■ In either case (whether choateness occurred when Capital demanded payment from Singleton and F & D or when Singleton actually paid Capital), Singleton's right of setoff was inchoate at the time the last notice of federal tax lien was filed and, therefore, each tax lien (which arose at an even earlier date upon assess-

ment) takes priority over Singleton's right of setoff. When Singleton finally paid Capital, Singleton's subrogation—upon paying Capital—to Capital's rights related, under Virginia law, back in time to when Singleton became a surety via execution of the F & D bond. *Dickenson v. Charles*, 4 S.E.2d at 353–55. The payment of Capital, however, came too late under the federal choateness doctrine: in the meantime the tax liens had attached and their priority could not be undone by state law relation-back doctrines. *United States v. Security Trust & Sav. Bank of San Diego*, 340 U.S. 47, 49, 71 S.Ct. 111, 95 L.Ed. 53 (1950); *Bank of Nevada v. United States*, 251 F.2d 820, 824–25 (9th Cir.1957) (bank's right of setoff arising from a debt not in existence when tax liens arose could not achieve choateness to defeat tax lien via treating setoff as relating back to date of contract with depositor).

Singleton's right of setoff with respect to amounts owed for equipment delivered after it had made its first payment to Capital is junior to the tax liens. Even if the setoff right and the tax liens are viewed as attaching at the same time to accounts payable arising after Singleton first paid Capital, the tax liens take priority. *McDermott*, 507 U.S. at 453–55, 113 S.Ct. 1526 (rule applies even in the case of § 6323(a)) and particularly at 454 n. 7 ("Parity may be, as the dissent says, a 'well recognized common-law rule,' [citation omitted] but we have not hitherto adopted it as the federal law of tax liens in 127 years of tax lien enforcement."); *MDC Leasing Corp. v. New York Property Ins. Underwriting*, 450 F.Supp. 179, 181–82 (S.D.N.Y.), *aff'd*, 603 F.2d 213 (2d Cir. 1979); *United States v. Graham*, 96 F.Supp. 318 (S.D.Cal.1951), *aff'd sub nom. California v. United States*, 195 F.2d 530 (9th Cir.), *cert. denied*, 344 U.S. 831, 73

S.Ct. 36, 97 L.Ed. 647 (1952). This is even the rule under § 6323(a).

■ Singleton could have protected itself: when it negotiated its contract with M & T, Singleton could have insisted that the written contract contain a condition that nothing would be owed M & T if M & T was in default of paying its supplier. However, it failed to take that step. Singleton and F & D argue that Singleton had a right of recoupment. However, as cases they cite recognize, recoupment means "the right of the defendant to have the plaintiff's monetary claim reduced by reason of some claim the defendant has against the plaintiff arising out of the very contract giving rise to the plaintiff's claim." *Thompson v. Board of Trustees of Fairfax County Police Officers Retirement System*, 182 B.R. 140, 146 (Bankr.E.D.Va. 1995), *quoting First National Bank of Louisville v. Master Auto Serv. Corp.*, 693 F.2d 308, 310 n. 1 (4th Cir.1982).[24] Here, Singleton relies on obligations to Capital based on a bond and a guarantee, whose satisfaction gave rise to a right of subrogation to Capital's rights. In asserting a right of setoff, Singleton relies on Capital's contract with M & T, not on its own contract with M & T. These separate transactions give rise to a right of setoff, not recoupment.[25]

Nevertheless, Singleton may have defenses based on contractual provisions (in its own contract or in Capital's) that were not reduced to writing, the issue to which the court turns in part VIII. However, first the court addresses in parts VI and VII the arguments that even without such contractual provisions, M & T had no property right in the amounts owed it under Singleton's Purchase Order, and that, in any event, under surety principles Singleton was subrogated to M & T's rights.

## VI

### *M & T'S PROPERTY INTEREST IN AMOUNTS IT EARNED*

Singleton contends that it is unnecessary for the court to address the question of lien priority because M & T does not have a property interest in the part of the Singleton/M & T Purchase Order proceeds that are subject to its right of setoff. The court concludes that, unless there was a contractual provision to the contrary, M & T's claims against Singleton are property of the estate, Virginia law having neither imposed a trust for materialmen on

**24.** *See also National Bank & Trust Co. at Charlottesville v. Castle*, 196 Va. 686, 85 S.E.2d 228, 234 (1955) *quoting* Burk's Pleading and Practice, 4th ed., § 247, p. 438 ("Recoupment ... is the right of the defendant to cut down or diminish the claim of the plaintiff in consequence of his failure to comply with some provision of the contract sought to be enforced, or because he has violated some duty imposed upon him by law in the making or performance of that contract."). *Castle* does not aid Singleton. That case involved a subcontractor whose contract with the general contractor provided for the subcontractor to assume toward the general contractor all obligations that the general contractor assumed toward the owner. The general contractor had agreed with the owner that the general contractor was liable for claims for

materials furnished for the building. When the subcontractor failed to pay its materialmen, the general contractor was entitled to invoke the provision in the contract as a recoupment defense against paying the subcontractor's assignee. Singleton cannot point to any similar provision in its Purchase Order to M & T.

**25.** In a change order, Singleton later charged M & T for labor M & T failed to perform as required by the Singleton/M & T Purchase Order. That does constitute a case of recoupment reducing the total contract amount owed M & T. Similarly, Singleton is entitled to a credit for a payment for labor that it paid the IRS pursuant to the IRS's levy.

amounts owed a sub-subcontractor (here, M & T) by a subcontractor (here, Singleton), nor accorded a subcontractor like Singleton protection, beyond a right of set-off, against having to pay both the sub-subcontractor (here, M & T) and the sub-subcontractor's materialman (in contrast to the protection accorded by Virginia statute to an *owner* of only having to pay once for the work done on the owner's building).

In *Aquilino v. United States,* 363 U.S. 509, 512, 80 S.Ct. 1285, 4 L.Ed.2d 1365 (1960), the Supreme Court stated that "[t]he threshold question in this case, as in all cases where the Federal Government asserts its tax lien, is whether and to what extent the taxpayer had 'property' or 'rights to property' to which the tax lien could attach." Because the Internal Revenue Code does not create property rights, this threshold question is controlled by applicable state law. *Id.* at 513, 80 S.Ct. 1285. However, once a court determines that a taxpayer has property or rights to property under state law, the consequences are governed by federal law. *Id.* at 513, 80 S.Ct. 1285. *See also Central Bank,* 843 F.2d at 1304.

 Therefore, at least as an initial matter, the extent of M & T's property interest in the Singleton/M & T Purchase Order proceeds must be determined in accordance with the law of Virginia, the site of the Dulles Project. *See Glassman Constr. Co. v. Fidelity and Casualty Co. of New York,* 356 F.2d 340, 342 n. 5 (D.C.Cir. 1966), *cert. denied,* 384 U.S. 987, 86 S.Ct. 1890, 16 L.Ed.2d 1005 (1966).

## A. BASES OF DECISIONS FINDING NO PROPERTY RIGHT IN TAXPAYER

There are several different bases upon which courts have relied in holding that under applicable state law a taxpayer did not have a property interest in contract proceeds to which a federal tax lien could attach. At issue in *United States v. Durham Lumber Co.,* 257 F.2d 570 (4th Cir. 1958), *aff'd,* 363 U.S. 522, 80 S.Ct. 1282, 4 L.Ed.2d 1371 (1960), was whether a federal tax lien had priority over the claims of unpaid subcontractors to contract proceeds in the hands of the owner. The court ruled that the general contractor had no right to the contract proceeds which were subject to seizure under the tax lien because of provisions in North Carolina's mechanics' lien statute which effectively denied a contractor any right to contract proceeds until its materialmen had been paid.[26] Accordingly, the court held that the tax lien did not attach to the contract proceeds.

Other courts have held that a contractor does not have a property interest in progress payments to which a federal tax lien can attach where state law imposes a trust on such funds for the benefit of unpaid subcontractors. *See Aquilino v. United States,* 10 N.Y.2d 271, 219 N.Y.S.2d 254, 176 N.E.2d 826, 832 (1961) (on remand from the U.S. Supreme Court, court holds that pursuant to the New York trust fund statute contractor/taxpayer does not have a sufficient beneficial interest in money due from owner under construction con-

**26.** North Carolina law required a general contractor to file with the owner a statement of all sums due subcontractors before being paid, and the owner was directed to pay such sums directly to the subcontractors. In addition, a subcontractor could notify the owner directly, and if he did so, he would have a lien upon the improved property and an independent cause of action against the owner. After such notice, the owner could not reduce his liability to the subcontractor by payment to the general contractor, but as against the general contractor could take credit for any payments made to subcontractors. *Durham Lumber,* 257 F.2d at 573.

tract to which a federal tax lien can attach). *See also Selby v. Ford Motor Co.*, 590 F.2d 642, 644 (6th Cir.1979) (court determines in preference action that contractor does not have a sufficient beneficial interest in funds subject to the Michigan Builders Trust Fund Act to constitute property of the estate); *In re D & B Elec., Inc.*, 4 B.R. 263, 270 (Bankr.W.D.Ky.1980) (Kentucky trust fund statute); *Universal Bonding Ins. Co. v. Gittens and Sprinkle Enter., Inc.*, 960 F.2d 366 (3rd Cir.1992) (New Jersey trust fund statute).

Still other courts have concluded from the relevant contract terms that the contractor's property interest in progress payments is limited to the amount remaining after deducting the claims of unpaid subcontractors. *See Fidelity and Deposit Co. of Md. v. New York City Hous. Auth.*, 241 F.2d 142 (2nd Cir.1957) (federal tax lien defeated by contract term requiring as a condition precedent to payment proof that the taxpayer had satisfied the claims of its laborers and materialmen); *B.F. Goodrich Co. v. Simco, Inc.*, 406 F.Supp. 200, 201 (M.D.Ga.1976) (federal tax lien defeated by contract terms requiring contractor to pay for all labor and materials and allowing owner to deduct any sum necessary to settle outstanding obligations of the contractor); *In re Arnold*, 908 F.2d 52 (6th Cir.1990). *But see J.A. Wynne*, 641 F.2d at 209 (where the contractor had not exercised its contractual right to withhold progress payments to the taxpayer until after receiving the notice of tax levy the taxpayer had an interest in the progress payment to which the IRS levy could attach).

However, courts have refused to accord priority to unpaid subcontractors where state law or applicable contract terms do not limit a taxpayer's property interest in progress payments. *See Indiana Lumbermens' Mut. Ins. Co. v. Construction Alternatives, Inc.*, 161 B.R. 949 (S.D.Ohio 1992) (court holds that under Ohio law IRS tax lien attaches to contract proceeds ahead of unpaid subcontractors, rejecting argument that cases decided under Michigan, Tennessee and Kentucky law create legal precedent for imposing a constructive trust); *In re Service Corp. of America*, 115 B.R. 602 (Bankr.M.D.Tenn.1990) (court rules in favor of IRS tax lien because Tennessee law and the contract terms did not limit taxpayers right to payment). *See also D & B Elec.*, 4 B.R. at 269 (court holds that contract proceeds are not property of the estate, but warns that "[w]hile we seize upon the public policy rationale ... we observe that the strength of that reasoning would be attenuated in the absence of a statute from which a trust fund could be inferred. Put simply, we as a bankruptcy court must interpret, not make, state law").

## B. *SINGLETON'S RELIANCE ON KARNO–SMITH*

Singleton argues in favor of a broader proposition: whenever a contractor has a legal duty to pay the claims of its subcontractor's unpaid suppliers, the subcontractor's property interest in contract proceeds in the hands of the contractor is reduced by the total amount of such claims. Singleton cites *Karno–Smith Co. v. Maloney*, 112 F.2d 690 (3rd Cir.1940), in support of this proposition.[27]

---

**27.** *See also Hall v. U.S.*, 258 F.Supp. 173 (S.D.Miss.1966) (court holds that contract proceeds belong to unpaid supplier of delinquent taxpayer where contractor and its surety are obligated to pay the supplier under a bond); *United States v. Hampton Garment Co.*,

1971 WL 347 (S.D.N.Y.1971) (in remanding the case, the court states that it doubts clothing company assumed unequivocal liability to pay its contractor where it was also obligated to pay the contractor's unpaid laborers).

In *Karno–Smith*, the court determined that under New Jersey law a contractor had a right of setoff against an insolvent subcontractor where the contractor is obligated under a bond to pay the subcontractor's materialmen. The court then held that the subcontractor did not have a right to the funds in the hands of the contractor to which the tax lien or levy could attach. The court went on to state as follows:

> We think the equities of the case are clearly with the plaintiff. It finds itself in a dilemma forced upon it by the law. Under its contract it is obligated to its subcontractor and under its bond it must pay the latter's unpaid debt to its materialman. The two obligations arise out of the same transaction, but payment of the subcontractor's taxes pursuant to the collector's levy and demand will not and cannot discharge the obligation to the subcontractor's materialman which the statutory bond imposes upon the plaintiff. Under these circumstances it would be manifestly inequitable to enforce both obligations.... We think it clear that in a case of this kind the rights of the collector rise no higher than those of the taxpayer whose right to property is sought to be levied on.

*Karno–Smith*, 112 F.2d at 692.

This court, however, does not agree that the case law supports the broad proposition advocated by Singleton. First, as discussed above, the extent of a taxpayer's property or right to property is determined by applicable state law, which evidently varies greatly from state to state. *Karno–Smith* was decided under New Jersey law not Virginia law, and, otherwise, is not controlling precedent upon this court.

Second, the court does not agree with the proposition that the IRS' rights can rise no higher than the taxpayer's. That argument misses the point that the IRS's rights, unlike the taxpayer's, are governed by federal law once it is determined that the taxpayer has a property interest under state law to which the federal tax lien can attach.[28]

Third, the court is not convinced that the equities are always against imposing double liability. In this case, although Singleton may have been required to provide a bond, it could have protected itself by one of several contractual devices (*e.g.*, requiring M & T to provide a bond). The related argument that M & T will receive an unjust windfall is a false one; M & T's liability to Capital will not be extinguished, but, rather, Singleton will subrogate to Capital's claim against M & T. The real issue is whether Singleton will receive the same distribution on its subrogated claim as general unsecured creditors or benefit from a preferred legal status. That Singleton would be protected from double liability because of a right of setoff if not for the federal tax lien is simply a reflection of the favored status of such liens under federal law.

Fourth, the court believes that Singleton's emphasis upon whether a contractor has a direct legal obligation to its subcontractor's unpaid suppliers is misplaced. Upon satisfaction of that obligation, the contractor will be subrogated to the supplier's rights. The critical question is whether the supplier had a right to the contract proceeds that displaced the subcontractor's ownership of the right to the proceeds. The supplier may have had such a superior ownership of the contract proceeds owed the subcontractor, but only if the contract

---

28. It is unclear whether the court in *Karno–Smith* relied upon the right of setoff or state property law in reaching its conclusion. As discussed above, this court does not believe an inchoate right of setoff is effective against a prior federal tax lien

or applicable state law so provides. Otherwise, the contractor is limited to a right of setoff; and, as discussed above, the right of setoff is ineffective against a federal tax lien that arose before the right of setoff became choate (or, if the right of setoff could be treated as acquired by contract, before the right of setoff qualified as a security interest in existence under 26 U.S.C. § 6323(h)(1)).

## C. *CASES DECLINING TO ACCORD THE TAXPAYER NO PROPERTY RIGHT*

State law does not always give a subcontractor's suppliers an ownership interest, ahead of the subcontractor, in contract proceeds owed the subcontractor. The case of *Randall v. Colby*, 190 F.Supp. 319 (N.D.Iowa 1961), is instructive in understanding the proper boundaries of *Durham Lumber* and the other decisions discussed above. In *Randall* the court considered the priority of two mechanics lienors and the IRS to contract proceeds in the hands of the owner. Under the Iowa mechanics lien statute, an owner had the right to withhold payment from the general contractor for sixty days after the completion of the project unless the general contractor supplied the owner with a bond or lien waivers. *Id.* at 331–32.

The court held, first, that the owner is entitled to deduct from the contract proceeds its damages for breach of contract by the general contractor. *Id.* at 324–25. The court held, second, that the mechanics lienor who filed its lien within sixty days after completion of the project should be paid ahead of the United States. *Id.* at 332. The court held, third, that the mechanics lienor who filed its lien more than sixty days after the completion of the project should not be paid ahead of the United States. The court explained that:

in cases involving competition between a Federal tax lien and competing claims of subcontractors, if, following the coming into existence of a tax lien, there is an open period during which the owner cannot take credit for the claims of the subcontractors against the contract price, the Federal tax lien attaches at that time ahead of the claim of the subcontractors. Under Iowa law it would seem that, where more than sixty days have elapsed since the completion of a building and no mechanic's liens of subcontractors are on file, there would be an open period at which time a pre-existing Federal tax lien against the Contractor would attach to the balance due, and that having so attached it would have priority over subcontractors' mechanic's liens subsequently filed.

*Id.* at 336.

 The court agrees with the analysis in *Randall* that a pre-existing federal tax lien will attach to progress payments if there is any point in time when the taxpayer has a right to those payments under the contract and applicable state law. *Id.* at 337. Upon assessment, federal tax liens attach immediately to any property or right to property of the taxpayer. 26 U.S.C. § 6322; *Texas Oil and Gas Corp. v. United States,* 466 F.2d 1040, 1052, *cert. denied sub nom. Pecos County State Bank v. United States,* 410 U.S. 929, 93 S.Ct. 1367, 35 L.Ed.2d 591 (1973). *See also United States v. Safeco Ins. Co.,* 870 F.2d 338, 341 (6th Cir.1989) ("The fact that a taxpayer's 'right to property' may be restricted or his enjoyment postponed does not prevent attachment.") (citations omitted). The one caveat in the case of progress payments is that the IRS has no right to the payments until the taxpayer has earned them (that is, until the taxpayer has fulfilled its obligations under the contract and applicable state law).

Moreover, once the federal tax lien attaches to property the consequences are governed by federal law. *See Cache Valley Bank,* 866 F.2d at 1244. Under federal law, courts have refused to allow prior federal tax liens to be defeated by provisions recognized by state law that divest a taxpayer's right to property.[29] Therefore, the essential question is not whether the taxpayer would have a right to the progress payments absent the federal tax lien, but, rather, whether the taxpayer had a right to the payments at any time after the federal tax lien arose. Nor does this analysis conflict with the decisions discussed above in which a federal tax lien was defeated by the claims of unpaid subcontractors. In all of those cases, there was never a point in time when the taxpayer had a right to the contract proceeds, either because the taxpayer had breached the terms of the contract or state law denied the taxpayer any right to payment.

### D. *VIRGINIA LAW GAVE M & T A PROPERTY RIGHT*

Accordingly, the court must determine if there was any point in time after the federal tax liens arose that M & T had a right to payment under the Singleton/M & T Purchase Order. However, for purposes of this discussion, the court is not concerned with whether M & T materially breached the terms of the Purchase Order; nor is the court concerned with Singleton's right of setoff (which became choate only after the tax liens attached to any amount owed M & T). Instead, the court is seeking to determine whether the terms of the Purchase Order or Virginia law required M & T to satisfy the claims of Capital before it would have a right to payment from Singleton.

First, although the written Purchase Order provides that "5% shall be retained until approval of Operation and Maintenance manuals," it otherwise does not contain a single provision that even arguably might limit M & T's right to payment until it paid its suppliers. Absent the admissibility of contrary parol evidence, the terms of the written Purchase Order clearly distinguish this case from the holdings in *Fidelity and Deposit Co.,* 241 F.2d at 147, and *B.F. Goodrich Co.,* 406 F.Supp. at 202.

Second, none of the parties have claimed that mechanics' liens were filed against the construction site, pursuant to Va.Code Ann. § 43–3, or that personal liability was imposed upon the owner or general contractor, pursuant to Va.Code Ann. § 43–11. Moreover, the court has doubts about whether the Virginia mechanics' lien statute is even applicable to the Dulles Project, in light of the fact that the WMAA is a public entity created pursuant to a compact between Virginia and the District of Columbia. *See Hechinger v. Metropolitan Washington Airports Auth.,* 36 F.3d 97 (D.C.Cir.1994), *cert. denied,* 513 U.S. 1126, 115 S.Ct. 934, 130 L.Ed.2d 880 (1995). In any case, the Virginia mechanics' lien statute does not contain the stringent protections found in the controlling statute in *Durham Lumber,* 363 U.S. at 525, 80 S.Ct. 1282.

Third, Virginia law does not contain a trust fund statute for the benefit of unpaid

---

**29.** *See Bank of Celina,* 721 F.2d at 169 ("That the funds at issue became the bank's property under state law does not, however, answer the question of whether the tax lien followed the property into the bank's hands.... Although state law controls the issue of whether property exists to which a tax lien may attach in the first instance, federal law ... governs the question of how far an attached tax lien follows encumbered property. The district court correctly held that the government's lien entitled it to the monies...."); *United States v. Riggs Nat'l Bank,* 636 F.Supp. 172 (D.D.C.1986) (forfeiture provision may be effective against ordinary creditors, but it cannot defeat an IRS assessment).

suppliers. *See Kayhoe Constr. Corp. v. United Virginia Bank,* 220 Va. 285, 257 S.E.2d 837, 839 (1979) (although Va.Code Ann. § 43–13 [30] "creates a moral obligation, it contains no language creating a legal trust for the benefit of materialmen and laborers."); *Vansant and Gusler Inc. v. Washington,* 245 Va. 356, 429 S.E.2d 31 (1993); *Perrin & Martin, Inc. v. United States,* 233 F.Supp. 1016, 1020 (E.D.Va. 1964) (under Virginia law "a materialman who had not perfected his lien was simply a general creditor of the subcontractor who had ordered the materials").

In *Glen Constr. Co., Inc. v. Bank of Vienna,* 410 F.Supp. 402, 406 (E.D.Va. 1976), *rev'd on other grounds,* 557 F.2d 1050 (4th Cir.1977), the court considered whether a subcontractor had a property interest under Virginia law in contract proceeds to which federal tax liens could attach. The court held that the federal tax liens had priority over the claims of the subcontractor's unpaid suppliers to the subcontract proceeds in the hands of the general contractor. The court explained:

> Virginia law does not provide that funds retained by a contractor from payments made by the owner and owing to the sub-contractors are held in trust for the benefit of the sub-contractors. From this, the Court further holds that the theory that Scott Kurt has no property interest in the interpleaded funds is refuted. Therefore, Scott Kurt did have an interest in the fund due from Glen to which the Government could attach its lien.

*Id.* at 406. *See also Perrin & Martin,* 233 F.Supp. at 1019–20 (federal tax liens have priority over the claims of an unpaid materialman to interpleaded contract retainages) [31]; *Ripley v. United States,* 71 A.F.T.R.2d 93-1733 (E.D.Va.1993), *aff'd sub nom. Ripley v. Bailey,* 27 F.3d 563 (4th Cir.1994) (the court held that federal tax liens have a priority over unpaid materialmen with unperfected mechanics' liens, and rejected the argument that Virginia law imposed an equitable lien in favor of unpaid laborers).

Singleton responds that *Glen Construction Co.* is inapposite, because the general contractor in that case did not have an independent legal obligation to satisfy the claims of unpaid suppliers. Instead, Singleton suggests that the case of *Nicholas v. Miller,* 182 Va. 831, 30 S.E.2d 696 (1944), is more directly relevant.

In *Nicholas,* the owners of improved property had entered into a written guarantee agreement with a supplier of the general contractor and were also confronted with mechanics' liens from other unpaid suppliers. The court held that the mechanics' lienors recovery was limited to the amount in the hands of the owners after deducting the sum owed pursuant to the guarantee agreement. The court explained that an owner was protected by the "well-defined legislative policy in Virginia ... that generally the extent of liability of the owner to a subcontractor or subcontractors is limited to the amount the owner is indebted to the general contractor at the time notice to the owner is given by the subcontractor or subcontractors."

---

**30.** Va.Code Ann. § 43–13 is a criminal statute prohibiting contractors from using contract proceeds for a purpose other than to pay those providing labor and material to the construction project.

**31.** However, it is worth noting that the court in *Perrin & Martin* stated as follows: "Perrin & Martin [contractor] were not personally liable to Clark [taxpayer's unpaid supplier]. It is this factual distinction which causes the case to differ from *United States v. Durham Lumber Company ....*" *Perrin & Martin,* 233 F.Supp. at 1019. However, the court did not opine whether Virginia would apply the rule of *Durham Lumber* had the factual distinction not existed.

*Nicholas,* 30 S.E.2d at 697. In other words, an owner "is required to pay for the building but once." *Id.*

The court concluded that a "subcontractor can, by mutual agreement with the owner, still have the latter guarantee his account, and if the owner does so, he is entitled to deduct the amount so guaranteed from the contract price, both as against the general contractor and the other subcontractors." *Id.* at 698. Moreover, the court found this to be true even if "it would result in a preference of one subcontractor over another." *Id.*[32]

However, this court is not convinced that *Nicholas* is controlling precedent in the present case. The owners in *Nicholas* were protected by a "well-defined legislative policy in Virginia" that ensured that they only paid once for the improvements to their real property.[33] Moreover, the guarantee agreement in *Nicholas* between the owner and the supplier was made with the consent of the general contractor. *Id.* at 699. *See also Thomas & Co. v. McCauley,* 143 Va. 451, 130 S.E. 396, 397–98 (1925) (relied upon in *Nicholas,* the decision specifically noted that the owner's guarantee "was made with the full knowledge, acquiescence and approval of Lang [the contractor]").

In addition, Singleton's liability to Capital is not based upon the Virginia mechanics' lien statute, but, rather, the Fidelity payment bond; and no "well-defined legislative policy in Virginia" protects sureties from double liability. In *Vulcan Materials Co. v. Betts,* 315 F.Supp. 1049, 1053 (W.D.Va.1970), the court held that under Virginia law a general contractor that has paid its subcontractor the amount due under the contract is not relieved of its liability to the subcontractor's unpaid supplier under a surety bond. *See also Noland Co. v. West End Realty Corp.,* 206 Va. 938, 147 S.E.2d 105, 110 (1966) ("payments by Kayhoe [general contractor] operated to discharge only the liability to its subcontractors and not the liability to pay for all labor and materials incurred under the prime contract and the bond").

In *In re Sinicrope,* 21 B.R. 476, 478 (Bankr.W.D.Va.1982), the court considered the relevance of the Virginia mechanics' lien statute to the liability of a surety. The court stated that "[t]he limitation of the owner's liability to the amount remaining unpaid under the contract in no way affects the liability of the surety. The statutory limitation of the owner's liability is designed to relieve the owner of the possibility of having to make double payment under the contract. . . . The subcontractors are entitled to the full value of the work performed or materials supplied on the project. Either the principal or the surety must make them whole." *Id.* at 478.

Moreover, the Supreme Court of Virginia has made clear in several instances that a contractor and its surety can protect themselves from double liability by requiring bonds (or presumably some other contractual device) from the contractor's subcontractors. *See Thomas Somerville Co. v. Broyhill,* 200 Va. 358, 105 S.E.2d 824, 828 (1958) ("[t]hey [contractors and sureties] may readily protect themselves against the shortcomings of subcontractors by requiring bonds of the latter"); *Solite Masonry,* 232 S.E.2d at 761–62. *See also Vulcan Materials,* 315 F.Supp. at 1051.

The court recognizes that the question of a contractor's liability to unpaid suppli-

---

32. The court emphasized that this result was especially appropriate when the guaranty was needed to complete the building. *Id.* at 698.

33. Virginia's existing mechanics' lien statute similarly protects owners' from paying more than once for the improvements to their real property. *See* Va.Code Ann. §§ 43–7, 11.

ers under a bond after it has already paid its subcontractor is different from the question of a contractor's liability to its subcontractor once it has paid its subcontractor's suppliers. However, the court does not believe that this difference alters the fundamental fact that under Virginia law a contractor obligated under a surety bond can be subjected to double liability. Virginia law normally does provide a contractor in Singleton's position with a means of avoiding double liability (*i.e.*, the right of setoff), albeit one that can be ineffective as to a federal tax lien.[34]

Unlike an owner, Virginia has no statute that limits a contractor's liability to a subcontractor, even when the contractor has taken on obligations to the subcontractor's supplier that subject it, as here, to the risk of double liability. At the time the federal tax liens arose in this case no claims had been made against the Fidelity bond, nor obviously had any payments been made under the bond. Therefore, Singleton's argument, in essence, boils down to the assertion that under Virginia law the very existence of the bond, without a claim or payment having been made, somehow obstructed M & T from acquiring a property interest in the Purchase Order, such that the federal tax liens could not attach to the contract proceeds. Singleton has not cited to any case law to support such a proposition; nor does the court believe that any such rule of law exists. At most, a claim (or payment) under the bond gives rise to a right of setoff, but, as discussed above, that state law remedy is ineffective against a prior federal tax lien.

However, the court further holds that the federal tax liens attached to the contract proceeds of the Singleton/M & T Purchase Order to the extent that M & T earned payment thereunder; and Singleton's right of setoff is ineffective to the extent that the federal tax liens so attached. As will be seen in part VII, below, there is no other equitable theory upon which Singleton has a superior interest in any amounts that would otherwise be owed M & T. The question of the extent, if any, to which M & T earned payment under the Purchase Order will be dealt with in part VIII, below.

## VII

### ARGUMENTS BASED ON SUBROGATION TO M & T'S RIGHTS

■ The court turns to Singleton's and F & D's argument that Singleton had a superior right in any amount owed M & T based on subrogation to M & T's rights, sometimes characterized as creating an equitable lien. These arguments rest on *Pearlman v. Reliance Ins. Co.*, 371 U.S. 132, 83 S.Ct. 232, 9 L.Ed.2d 190 (1962), and antecedent decisions of the Supreme Court. Virginia law may incorporate the equitable principles articulated in *Pearlman*. *International Fidelity Ins. Co. v. Ashland Lumber Co.*, 250 Va. 507, 463 S.E.2d 664 (1995); *Glassman Constr. Co. v. Fidelity & Cas. Co.*, 356 F.2d 340 (D.C.Cir.1966). However, as in the court's discussion of the priority of the federal tax liens over Singleton's equitable right of setoff arising from subrogation to Capital's rights, the court concludes for similar reasons that the federal tax liens are entitled to priority over any subrogation right arising under *Pearlman*.

---

**34.** As discussed above, a setoff right arising only under equitable principles is defeated by a tax lien if the right of setoff became choate only after the federal tax liens arose. If the right of setoff was acquired by contract, the right is defeated by a tax lien if the right failed to qualify under 26 U.S.C. § 6323(h)(1) as a security interest in existence prior to the filing of notices of tax lien.

In *Pearlman,* a contractor provided to the federal government, as required by the Miller Act, 40 U.S.C. § 270a, *et seq.,* a payment bond under which the surety was obligated to satisfy any unpaid claims of laborers and materialmen. The contractor defaulted, and the surety paid the laborers and materialmen. When the contractor ended up in a bankruptcy case, the United States held $87,000 in retained funds, and the question was "whether the surety had, as it claimed, ownership of, an equitable lien on, or a prior right to this fund before bankruptcy adjudication." *Pearlman,* 371 U.S. at 135, 83 S.Ct. 232. The Court held

> that the Government had a right to use the retained fund to pay laborers and materialmen; that the laborers and materialmen had a right to be paid out of the fund; that the contractor, had he completed his job and paid his laborers and materialmen, would have become entitled to the fund; and that the surety, having paid the laborers and materialmen, is entitled to the benefit of all these rights to the extent necessary to reimburse it.

*Pearlman,* 371 U.S. at 141, 83 S.Ct. 232. This subrogation of the surety is sometimes referred to as an "equitable lien." *American Fidelity Co. v. National City Bank of Evansville,* 266 F.2d 910, 914 (D.C.Cir.1959).

■ Nevertheless, *Pearlman* is of no help to Singleton here: a surety's superior right to the retained funds, whether called subrogation or an equitable lien, is fixed only on breach of bond obligations by the contractor. *See Henningsen v. United States Fidelity & Guaranty Co.,* 208 U.S. 404, 410, 28 S.Ct. 389, 52 L.Ed. 547 (1908). M & T never entered into a bond contract with Singleton or anyone else: as already noted, Singleton neglected to take that step to protect itself of requiring M & T to furnish a bond. The discussion in *Pearlman* of "the contractor, had he completed

his job and paid his laborers and materialmen, would have become entitled to the fund," presupposes that payment of laborers and materialmen was a condition to the contractor's receiving payment. Unless M & T and Singleton agreed to such a condition, M & T was entitled to payment without first paying its supplier, Capital. Whether the "pay-when-paid" provision of the M & T/Capital Purchase Order precludes introduction of parol evidence to show such an agreement is addressed in part VIII, below.

■ However, even if the lack of a bond contract would not be fatal to imposition of subrogation of Singleton to M & T's contract rights to impose an equitable lien, *Pearlman* and its antecedents depend on a relation-back doctrine to defeat intervening rights of other creditors. *See Prairie State National Bank of Chicago v. United States,* 164 U.S. 227, 232, 239–40, 32 Ct.Cl. 614, 17 S.Ct. 142, 41 L.Ed. 412 (1896) (surety's subrogation rights took precedence over bank's rights arising from assignment from contractor because the right of subrogation relates back to, and is viewed in equity as having come into existence, when the suretyship obligation was first established). As stated in *American Fidelity,* 266 F.2d 910 at 914:

> a surety has the right to be subrogated, as of the date of his bond, to the rights and preferences of anyone to or for whom he is thereafter required to pay. This right is *potential only* until the contractor's default causes the surety to pay. *It is a shadowy thing until it is given substance by the occurrence of a loss to the surety; theretofore a mere right to subrogation, it then becomes an actuality.* And the law gives the surety the added advantage of having subrogation effective as of the date of his original undertaking.

[Emphasis added.] As already discussed with respect to Singleton's rights of setoff

(also arising from subrogation), such relation back doctrines do not suffice to render a surety's shadowy subrogation rights choate at the time a federal tax lien intervened before there was a default. *Pearlman* does not give a surety an equitable lien superior to tax liens attaching prior to the amount owed under the bond becoming fixed. *See Indiana Lumbermens Mut. Ins. Co. v. Construction Alternatives, Inc. (In re Construction Alternatives, Inc.),* 2 F.3d 670 (6th Cir.1993) (applying "first in time, first in right rule" to defeat any equitable lien surety might have through subrogation). *See also Capitol Indemnity Corp. v. United States,* 41 F.3d 320, 326 (7th Cir.1994) (surety's subrogation rights defeated by tax lien: actual subrogation only occurs when payments are made on contractor's default, and that occurred only after tax lien had already attached).

Moreover, the amounts at issue here are progress payments, not retainages. Under state law, the surety's right to progress payments may arise only upon default, and, unlike the case of retainages, may not relate back to defeat another creditor. *See International Fidelity Ins. Co. v. United States,* 949 F.2d 1042, 1046–47 (8th Cir.1991) (applying Missouri rule). The court need not decide what the rule would be in Virginia because the federal tax liens take priority under the choateness doctrine even if Virginia followed a relation-back rule in the case of progress payments.

## VIII

*WHETHER PAROL EVIDENCE CREATED AN ADDITIONAL CONTRACT TERM OR ESTABLISHED A TRUST IN CAPITAL'S FAVOR DEPRIVING M & T OF ANY RIGHT TO PAYMENT FOR THE EQUIPMENT DELIVERED*

██ M & T moves for partial summary judgment on Count I on the basis that,

aside from a genuine issue of whether it performed certain labor, it otherwise substantially performed its obligations under the Singleton/M & T Purchase Order. Singleton and F & D respond that, with respect to M & T's supplying of equipment (as distinct from labor), the parties intended M & T to be a mere conduit entitled to receive only a 3% fee on the price of the equipment charged M & T by Capital, and that the parties intended that payment for the equipment itself (the price Capital charged) would flow to Capital, as a matter of contract law or trust law. They also point to alleged misconduct by the IRS and M & T that should give rise to a constructive trust.

Singleton and F & D cite *Mid–Atlantic Supply, Inc. v. Three Rivers Aluminum Co.,* 790 F.2d 1121 (4th Cir.1986), in which the court held, under Virginia law, that a contractor's joint check to its subcontractor and the subcontractor's supplier pursuant to a three-way agreement was not part of the subcontractor's bankruptcy estate because it was held in trust for the supplier. The supplier insisted upon some arrangement to address the subcontractor's shaky credit. Specifically, the supplier insisted upon an arrangement whereby the contractor would issue a joint check which would assure that "the monies would come through a joint check arrangement and would be within the control of [the supplier]." *Mid–Atlantic,* 790 F.2d at 1123. Both the subcontractor and the contractor agreed to this arrangement. *Id.* Here, in contrast to *Mid–Atlantic,* Capital as M & T's supplier did not insist upon M & T's agreeing in its Purchase Order to such an arrangement, even though it was concerned about M & T's creditworthiness. Instead, Capital relied upon Thomas Singleton's oral guarantee that Capital would get paid.

If there was no binding arrangement with M & T requiring that Capital receive payment out of a joint check to assure that it got paid (or some other trust arrangement), this case is more like *Glen Constr. Co., Inc. v. Bank of Vienna*, 557 F.2d 1050 (4th Cir.1977). Even though the contractor paid via joint checks pursuant to an agreement with the supplier, the subcontractor apparently had not agreed to joint checks, and the contractor did not contract with the supplier to buy the materials for its own account. The subcontractor remained the purchaser from the supplier, and the subcontractor was billed by the supplier as such. Accordingly, when the contractor interpled the remaining amount it owed the subcontractor, the IRS's superior interest in the funds, rather than any default by the contractor, deprived the supplier of the funds.

### A. PAROL EVIDENCE AND SINGLETON'S CONTRACT DEFENSE

Regarding the alleged contractual defense, M & T and the IRS argue as follows: (1) Singleton's liability to M & T is clear from the terms of the Purchase Order; (2) parol evidence is inadmissable under Virginia law to alter the terms of the Purchase Order; (3) it is undisputed that the vast majority of equipment covered by the Purchase Order was delivered to the Dulles Project; and (4) the dispute over M & T's alleged breach of the labor portion of the Purchase Order can be reserved for trial.

Singleton and F & D respond that there is a factual dispute whether M & T breached its contract with Singleton when it refused to endorse over to Capital the November 30, 1994, check because (1) the Purchase Order is a contract for the supply of goods and, therefore, is governed by the Virginia Uniform Commercial Code ("UCC")—Sales (Va.Code Ann. §§ 8.2–101 through –725); (2) under the Virginia UCC, parol evidence is admissible to show course of dealing or usage of trade; (3) parol evidence is admissible because the Purchase Order does not represent the complete agreement of the parties;[35] and (4) parol evidence would establish that the parties' intent was for M & T to receive a 3% fee on the equipment supplied by Capital, via joint checks (made out to M & T and Capital) or other similar means.

Under Virginia law, Singleton would be excused from performing under the Purchase Order (*i.e.* paying M & T) only if M & T committed a material breach of the contract. *See RW Power Partners, L.P. v. Virginia Elec. and Power Co.*, 899 F.Supp. 1490 (E.D.Va.1995). Establishing that M & T committed a material breach of the contract would require the admission of parol evidence establishing that M & T was required to endorse over to Capital the check made payable to M & T.

### 1. The Virginia Rules Regarding Parol Evidence

The general rule in Virginia is that parol evidence " 'is inadmissible to vary, contradict, add to, or explain the terms of a complete, unambiguous, unconditional, written instrument.' " *Langman v. Alumni Ass'n of the Univ. of Va.*, 247 Va. 491, 442 S.E.2d 669, 674 (1994) (citations omitted). *See also Galloway Corp. v. S.B. Ballard Constr. Co.*, 250 Va. 493, 464 S.E.2d 349, 354 (1995).

---

**35.** Singleton points out that the Purchase Order makes no mention of several significant contract terms, including the following: Capital was the agreed upon supplier; Siemens was the agreed upon manufacturer; and M & T was required to perform labor at the Dulles Project.

Under the Virginia UCC,[36] parol evidence is admissible in certain circumstances. Under Va.Code Ann. § 8.2–202:

Terms with respect to which the confirmatory memoranda of the parties agree or which are otherwise set forth in a writing intended by the parties as a final expression of their agreement with respect to such terms as are included therein may not be contradicted by evidence of any prior agreement or of a contemporaneous oral agreement but may be explained or supplemented

(a) by course of dealing or usage of trade (§ 8.1–205) or by course of performance (§ 8.2–208); and

(b) by evidence of consistent additional terms unless the court finds the writing to have been intended also as a complete and exclusive statement of the terms of the agreement.

*See Columbia Nitrogen Corp. v. Royster Co.,* 451 F.2d 3, 9 (4th Cir.1971); *Continental Ins. Co. v. City of Virginia Beach,* 908 F.Supp. 341, 348 (E.D.Va.1995).

■ The question of the admissibility of parol evidence raises several difficult questions, including: (1) whether the Purchase Order is a complete written agreement; (2) whether the Purchase Order is ambiguous in regard to the terms of payment; and (3) whether the parol evidence sought to be introduced is consistent with the express terms of the Purchase Order. On the one hand, parol evidence should not be admissible to establish a contractual

term which fundamentally changes the written contract that a court would normally expect the parties to have expressly addressed the issue. *See Chas H. Tompkins Co. v. Lumbermens Mut. Cas. Co.,* 732 F.Supp. 1368 (E.D.Va.1990). On the other hand, parol evidence is admissible to supply a term that the written contract failed to supply.[37]

### 2. *The Written Agreements*

In regard to payment, the Singleton/M & T Purchase Order states under "Standard Conditions" that:

PAYMENT OF THIS ORDER WILL BE IN ACCORDANCE WITH PAYMENT AS RECEIVED FROM OWNER.

The Purchase Order otherwise is directed to M & T from Singleton, with no indication that Capital is to receive a part of the payments. The Purchase Order recites a total price of $1,500,000.00, making no distinction between the labor component (which Singleton concedes was owed to M & T, not Capital) and the equipment component.[38]

In contrast, the M & T/Capital Purchase Order expressly addressed the issue of payments to M & T by providing in paragraph 11 that:

Capitol [sic] Lighting Supply acknowledges that payments to M & T Electric Inc. by Singleton Electric Co. for material on this purchase order is [sic] an express condition precedent to M & T

---

**36.** As pointed out by F & D, the fact that the Purchase Order provided for a relatively small amount of labor should not remove the contract from inclusion under the Virginia UCC. *See United States v. City of Twin Falls, Idaho,* 806 F.2d 862, 870–71 (9th Cir.1986), *cert. denied sub nom. City of Twin Falls, Idaho v. Envirotech Corp.,* 482 U.S. 914, 107 S.Ct. 3185, 96 L.Ed.2d 674 (1987).

**37.** The parties largely concentrated upon the issues related to Singleton's right of setoff vis-a-vis the federal tax liens, and did not thoroughly brief the issues that the proffered parol evidence raises. These issues proved as challenging as the setoff and tax lien priority issues.

**38.** It then recites that "5% shall be retained until approval of Operation and Maintenance manuals."

Electric Inc. obligation to pay Capitol [sic] Lighting Supply.

It is undisputed that this Purchase Order was sent to Capital. Capital's actions according to the terms of the Purchase Order constitute acceptance of the Purchase Order and of this term. *Galloway Corp.*, 464 S.E.2d at 356.

### 3. *Keeping the Analysis of the Two Contracts Separate*

The Singleton–M & T contract and the M & T–Capital contract were separate contracts, albeit they both shared a common element regarding how much Capital would charge M & T for supplying the equipment. Singleton entered into a contract with M & T requiring it to furnish and install equipment supplied by Capital to M & T. M & T, in turn, entered into a contract with Capital to purchase the equipment from Capital. Singleton did not attempt to address in its contract with M & T the question of what mechanism M & T and Capital would agree to regarding M & T's paying Capital.

In assessing the parol evidence rule, it is important both to keep the two contracts separate and to limit parol evidence, if admissible, to the contract to which it related.[39] In this regard, the parties, to varying degrees, appear to have fallen into two erroneous approaches in addressing the question of the admissibility of parol evidence.

First, they have treated the two contracts (the one between Singleton and M & T and the one between M & T and Capital) as though they were a single contract. While the two contracts may share some common ground, the parties have not pointed to evidence to show that all terms were common to both contracts.

Second, they have tended to treat the parol evidence regarding the Singleton/M & T Purchase Order as bearing on the interpretation of the M & T/Capital Purchase Order, and vice versa. However, the evidence does not always show that Singleton was aware of parol evidence of which Capital was aware, and vice versa.

### 4. *Parol Evidence is Admissible Regarding the Singleton/M & T Deal*

The Singleton/M & T Purchase Order cannot be viewed, within the meaning of Va.Code § 8.2-202(b) as having "been intended ... as a complete and exclusive statement of the terms of the agreement." No language exists to show such an intention, and numerous details were not addressed (for example, the manufacturer of the equipment or the supplier) (if the parties had settled on one). Accordingly, under Va.Code Ann. § 8.2-202(b), the court may consider parol evidence showing additional terms that are consistent with the terms of the Singleton/M & T Purchase Order, specifically, its provision that "PAYMENT OF THIS ORDER WILL BE IN ACCORDANCE WITH PAYMENT AS RECEIVED FROM OWNER." That provision is not inconsistent with an additional term requiring that payments to M & T for equipment would be endorsed to Capital so that Capital would receive payment for the equipment it supplied to M & T as a pass-through entity.

Parol evidence would be necessary to establish that the "pay-when-paid" provision (conditioning M & T's obligation to pay Capital) was part of Singleton's contract with M & T. A litigant can always

---

**39.** Even though Singleton has been subrogated to Capital's rights, that does not give Singleton the right to treat the terms of its contract with M & T as interchangeable with the terms of Capital's contract with M & T.

fight such parol evidence with other parol evidence.

Moreover, even if the "pay-when-paid" provision regarding paying Capital had been part of a written agreement between M & T and Singleton, parol evidence would be admissible to show a requirement of M & T endorsing in favor of Capital equipment payments from Singleton. First, the written agreement would still not have "been intended ... as a complete and exclusive statement of the terms of the agreement." Second, a joint check or similar arrangement would not necessarily be inconsistent with a provision that payment to M & T by Singleton for materials was an express condition precedent to M & T having an obligation to pay Capital. That provision could mean one of two things, either that M & T was to receive a payment and be entitled to endorse the payment in its own favor before paying Capital, or that until a check paying M & T was issued, no obligation existed to pay Capital. Parol evidence is always admissible to explain an ambiguity in a non-complete agreement, and if the parties had agreed to require endorsement over to Capital of any payment to M & T for equipment, the latter interpretation would prevail, and the additional term would not be inconsistent with the written agreement.

5. *The Parol Evidence Fails to Establish the Alleged Term in the Singleton–M & T Contract*

The court concludes that the evidence is insufficient, when viewed in the light most favorable to Singleton and F & D, to establish that a term of the Singleton–M & T contract was that M & T was required to endorse payments for equipment to Capital. There was no oral agreement for such a term, and the evidence of course of dealing, trade usage, and course of performance does not supply the term.

a. *Evidence of an Oral Agreement is Lacking*

For reasons set forth below, the court concludes that M & T and Singleton did not expressly agree, orally or in writing, to the check arrangement Singleton followed. Singleton entered into a contract with another DBE, ONI, to deliver equipment supplied by Capital for Singleton's contract with Mortenson. Capital told Singleton to deliver ONI's and M & T's checks to Capital. J. Singleton Dep. at 49–50. Singleton never talked to M & T about any such arrangement. J. Singleton Dep. at 51 and 53; T. Singleton Dep. at 103–104, 257–58. Singleton's acquiescence in Capital's request gave it no contract rights against M & T protecting it against the IRS's liens on M & T's account payable. *See Glen Constr. Co.*, 557 F.2d at 1051.

Singleton and F & D point to the following evidence as supporting an express contract for the check arrangement Singleton followed. M & T's Nguyen Son and Thomas Singleton discussed M & T charging a fee on the equipment for entering into a pass-through arrangement. Son quoted a percentage fee of the underlying equipment cost that Capital would be charging. Then Thomas Singleton and M & T's Earl Mitchell and Son met and finally agreed to a 3% markup of or fee on the cost of the equipment for acting as a DBE pass-through of the equipment. The purchase order would be for $1.5 million, most of which was for equipment but part for labor, so that M & T's charges beyond what Singleton would otherwise have paid Capital directly would be $65,000.00, with M & T agreeing to that $65,000.00. T. Singleton Dep. at 28, 62–63; Son Dep. At 19, 20, 38. The principal value of M & T in the transaction was that it would supply DBE credits. Singleton reported to Mortenson that it had a contract with M & T for purposes of DBE credit of $1.5 million. M & T's internal Contract Information

Sheet[40] treated this contract as a "pass through" contract and showed the total contract amount as $41,196.00, but there is no evidence that this internal memorandum was conveyed to Singleton or that M & T intended it to reflect how much it would be paid by Singleton as opposed to what it would clear from the deal net of the amount it would owe Capital.[41]

Even viewing this evidence in the light most favorable to Singleton and F & D, this evidence does not suffice to establish that M & T agreed to the check arrangement that Singleton unilaterally followed or any similar arrangement. M & T was to receive a purchase order for $1.5 million; the markup fee of 3% on the equipment price charged to M & T by Capital, with some labor as well, resulted in a purchase order price to M & T of $1.5 million, approximately $65,000 more than the price that Capital would have charged, without a middleman in place, for supplying the equipment alone. This evidence does not fix how that $1.5 million would be paid, it merely explains how the $1.5 million price was determined, and the economics of the deal. Similarly, the treatment of the deal as a pass-through deal merely reflected that M & T had to be brought into the picture to pass the equipment through M & T as a DBE in order for Singleton to get DBE credit: the

"pass-through" label is neutral on the question of whether payments would be endorsed to the supplier. Accordingly, no express agreement, written or oral, existed to require M & T to endorse equipment payments to Capital.

b. *The Evidence of Course of Dealing, Usage of Trade, and Course of Performance Does not Supply the Alleged Term*

Singleton and F & D rely on course of dealing, usage of trade, and course of performance evidence in an attempt to establish such an arrangement was part of the contract between Singleton and M & T. The court concludes that the proffered evidence, viewed in the light most favorable to Singleton and F & D, does not supply the alleged term.

*Course of Dealing.* Singleton and F & D have relied upon M & T's course of dealing[42] with Capital on prior contracts not involving Singleton, without citing evidence that Capital and M & T made Singleton aware of that prior course of dealing, so that evidence cannot supply a term of Singleton's contract with M & T.

They have not cited any evidence that Singleton and M & T had a course of dealing on prior contracts that included a similar check arrangement requiring M &

---

40. This document is Exhibit H to Capital's memorandum in support of its motion (DE No. 96) addressing various counts of the amended complaint. Singleton and F & D did not point to the document in their papers opposing summary judgment as to Counts I, II, and III. However, F & D made reference to it at closing argument without citation to its location in the record. Only snippets of Ronald Young's deposition, which supposedly authenticated this document, are attached to Capital's memorandum, and they do not authenticate the document. However, the court will treat the document as part of the evidence, without deciding its admissibility, because it does not alter the outcome.

41. No one has pointed to evidence explaining why M & T would have recorded this contract as worth $41,196.00 instead of $65,000.00.

42. Under Va.Code Ann. § 8.1–205(1), a course of dealing:

is a sequence of previous conduct between the parties to a particular transaction which is fairly to be regarded as establishing a common basis of understanding for interpreting their expressions and other conduct.

T to endorse the check to the supplier. The court can only assume that their investigation confirmed that Singleton had never done a check arrangement like this before with M & T or, for that matter, with any DBE. *See* John Singleton Dep. at 48–49.[43]

*Usage of Trade.* There is insufficient evidence of a usage of trade [44] to supply the check endorsement term that Singleton and F & D contend existed in the Singleton–M & T contract. As the case law already discussed reveals, joint checks are not the regular practice in the construction industry: they are a device, among several other options (*e.g.,* a letter of credit or a bond), that a supplier may request if the supplier is concerned about the subcontractor's creditworthiness. Here Capital did not insist upon this arrangement because it had a guarantee from Singleton. And Singleton neglected to bargain for such an arrangement. See T. Singleton Dep. at 257–58. The evidence of what practices have occurred in the case of minority contractors used for DBE credits is too anecdotal to qualify as a usage of the trade: regularity in a place, vocation or trade requires more than a showing that a few DBE subcontractors have engaged in the practice to give assurance to their suppliers that they would get paid.[45]

*Course of Performance.* The course of performance evidence [46] advanced to estab-

---

43. John Singleton was the officer of Singleton who was responsible for issuing checks. There is deposition testimony of another officer of Singleton, Thomas M. Singleton, who was not responsible for issuing checks, in which he appears to speculate that Singleton & M & T may have had such an arrangement on a prior contract, but Singleton and F & D have not relied on this testimony.

Thomas M. Singleton testified that he "believed" that the check arrangement it followed here was the system Singleton used on one other pass-through contract Singleton previously did. T. Singleton Dep. at 102–103. He identified the job on which Singleton used DBEs once in the past as "the M & T job that we did for WS & C back in the 1950's, compost facilities in Silver Spring." *Id.* at 258.

Thomas Singleton graduated from college in 1967 and there is no evidence that he worked at Singleton before then. *Id.* at 6–7. Even if the deposition transcript contained an error, and the WS & C job was after 1967, no showing was made that Thomas Singleton had personal knowledge of what check arrangement was actually followed with M & T on the WS & C job, and it is unclear whether there were other DBEs on the job with whom, in possible contrast to M & T, the check arrangement it used here was followed.

Singleton and F & D did not attach this evidence to their memoranda (instead, the IRS attached it to one of its memoranda and did not cite this particular passage). Singleton and F & D did not cite it at any time, such that there was no occasion for M & T and the IRS to argue the inadequacy of the evidence, including whether it would suffice to show that the parties' prior arrangement ought "fairly to be regarded as establishing a common basis of understanding for interpreting their expressions and other conduct" under Va.Code Ann. § 8.1–205(1).

44. Under Va.Code Ann. § 8.1–205(2), a usage of trade:

> is any practice or method of dealing having such regularity of observance in a place, vocation or trade as to justify an expectation that it will be observed with respect to the transaction in question.

45. On the Dulles Project, *after* Singleton and M & T had entered into their agreement, Singleton delivered other DBEs' checks directly to their suppliers. In addition, Capital had previously followed a practice of obtaining issuance of joint checks whenever it dealt with DBEs which it viewed as not creditworthy. Finally, M & T had used joint checks when it acted as a pass through DBE on other contracts. This evidence establishes the practice Singleton followed (after the fact), and the practices that Capital and M & T had followed. It does not establish a trade usage that would be binding in the case of all pass-through DBEs.

46. Under Va.Code § 8.2–208(1):

lish the contract term appears to be that (1) M & T's first two invoices on October 12, 1994, and October 18, 1994, bore notations that the invoices were payable by joint check, and (2) on invoices M & T used a "PT" numbering system standing for "pass through."

M & T's first two invoices requested a joint check, but that request was dropped when M & T submitted revised invoices on October 21, 1994. There is no evidence that M & T requested a joint check based on any agreement for joint checks. It was the understanding of Ronald Young of M & T that joint checks should be issued, but there is no showing that he based this understanding on anything other than M & T having issued joint checks in prior pass-through contracts. Indeed, Singleton declined to issue a joint check.[47] There has been no showing of reliance on M & T's first two invoices to the detriment of Singleton and Capital, nor a commitment by M & T that it would endorse joint checks to Capital.[48] The invoices that followed afterwards made no mention of joint checks.

Treating the contract as a "pass-through" contract reflected that Capital (chosen by Singleton) was supplying the equipment through M & T, a DBE, with which Singleton contracted in order for Singleton to achieve DBE credit. The "pass through" reference is neutral on any question of how payment under the contract was to be handled. Similarly, the reference on invoices to a "PT" number of the invoice is neutral on the question.

Accordingly, there is no parol evidence that supports a finding that the Singleton–M & T contract included a term that a check would be issued in favor of M & T but delivered to Capital for payment, with M & T required to endorse the check to Capital.

6. *Irrelevance of Any Term of the M & T–Capital Contract to the Singleton–M & T Contract*

If the M & T–Capital contract included a provision requiring M & T to endorse equipment payments to Capital, it was not communicated to Singleton in the formation of the Singleton–M & T contract, and Singleton and F & D have not offered evidence to show that Singleton is an intended third-party beneficiary of any such arrangement between Capital and M & T. Any breach of such an arrangement between Capital and M & T would have given Capital a breach of contract claim against M & T. However, it would not enhance Singleton's rights except by way of subrogation, and, as noted above, subrogation only gives rise to a right of setoff that is junior to the federal tax liens that arose before the setoff right became choate via Singleton's payments to Capital. However, that does not end the matter if

---

Where the contract for sale involves repeated occasions for performance by either party with knowledge of the nature of the performance and opportunity for objection to it by the other, course of performance accepted or acquiesced in without objection shall be relevant to determine the meaning of the agreement.

Under Va.Code § 8.2–208(3):

such course of performance shall be relevant to show waiver or modification of any term inconsistent with such course of performance.

47. Instead, Singleton first issued a check on November 30, 1994, made payable to M & T, but delivered it to Capital. M & T declined to endorse that check to Capital.

48. Moreover, the invoices came after M & T had already performed part of the contract, and hence after the federal tax liens had attached to the account receivable for that performance.

Capital and M & T agreed that payments to M & T for equipment would be held in trust for Capital (to the extent of the price Capital had charged M & T for the equipment).

### B. *THE PAROL EVIDENCE DOES NOT ESTABLISH AN EXPRESS TRUST IN FAVOR OF CAPITAL*

If M & T's contract with Capital included a term that placed the equipment proceeds (less M & T's markup) in trust for Capital, then Capital would have been the rightful owner of the amounts that Singleton paid it. Singleton could defend that the amount owed M & T had already been paid to the rightful owner of the account payable. (Although the argument may not have been cast precisely in these terms, it was implicit by reason of the citation to *Mid–Atlantic*, 790 F.2d at 1123.) So the critical question is whether the M & T–Capital contract included such a provision, that is, whether the parol evidence of record suffices to establish such a term under the standards for summary judgment.

#### 1. *Burden and Standard of Proving an Express Trust*

The burden rests on Singleton and F & D to establish the original trust relationship. *Georgia Pac. Corp. v. Sigma Serv. Corp.*, 712 F.2d 962, 969 (5th Cir. 1983), quoting 4 *Collier on Bankruptcy*, ¶ 541.13 at 541–67 (15th ed., 1983). As observed by our court of appeals, for a trust to be present, whether an express trust or a constructive trust, "the courts have uniformly required a contract irrevocably obligating the debtor both to segregate the "trust funds" from the debtor's own funds and to deliver the "trust funds" to the creditor." *In re Auto–Train Corp., Inc.*, 810 F.2d 270, 274 (D.C.Cir.1987). [Citations omitted.]

An illustrative case is *Sigma Service*. There, the debtor Sigma, a general contractor, received from the real property owner, Georgia–Pacific, joint checks made payable to Sigma and materialmen pursuant to a letter agreement with Georgia–Pacific for the latter to make payments via joint checks to ensure that the suppliers were paid promptly. *Sigma Service*, 712 F.2d at 964. *See also Sigma Service*, 712 F.2d at 971 n. 8 (quoting letter agreement in full). The court held that this was a mere unilateral agreement, with no evidence of action in reliance on the agreement, placing no affirmative duties on Sigma in relation to the suppliers (to endorse the checks to them), and pursuant to which Sigma was free to revoke its plan as proposed in the letter. *Sigma Service*, 712 F.2d at 971–72. Because there was no bilateral agreement establishing that the checks belonged to the materialmen, and hence there was no agreement giving the materialmen an irrevocable interest in the funds, the court held that no trust had been established. *Sigma Service*, 712 F.2d at 972.

Under Virginia law:

An express trust is created when the parties affirmatively manifest an intention that certain property be held in trust for the benefit of a third party. *See Peal v. Luther*, 199 Va. 35, 97 S.E.2d 668, 669 (1957); *Broaddus v. Gresham*, 181 Va. 725, 26 S.E.2d 33, 35 (1943). An express trust may be created "without the use of technical words." *Broaddus*, 26 S.E.2d at 35. All that is necessary are words, *see id.* at 35 (citation omitted), or circumstances, *see Woods v. Stull*, 182 Va. 888, 30 S.E.2d 675, 682 (1944) (citation omitted), "which unequivocally show an intention that the legal estate was vested in one person, to be held in some manner or for some purpose on behalf of another ...," *Bro-*

**480**

addus, 26 S.E.2d at 35; see also Schloss v. Powell, 93 F.2d 518, 519 (4th Cir. 1938).

Old Republic Nat. Title Ins. Co. v. Tyler (In re Dameron), 155 F.3d 718, 722 (4th Cir.1998). With respect to whether there was an express trust, the evidence that Singleton and F & D rely upon fails unequivocally to show that a trust was intended.

### 2. The Lack of Evidence of an Express Trust in this Case

M & T never agreed orally or in writing that the funds would be held in trust. Singleton and F & D rely upon evidence of course of performance and evidence of a course of dealing in the performance of other contracts between M & T and Capital to establish that a trust exists.

The course of performance evidence relied upon to establish a trust is M & T's Ronald Young having issued an invoice to Singleton, based on his past invoicing practices, calling for issuance of a joint check. No showing has been made that Capital was made aware of this invoice. Even if it was made aware of the invoice, there has been no showing that it relied upon the invoice: when Singleton delivered to Capital a check made payable to M & T, M & T refused to endorse the same.[49]

With respect to the course of dealing evidence of use of joint checks on prior contracts between M & T and Capital (for example, where Dynalectric was the general contractor), no evidence has been submitted to show that this was not required by the terms of the contractor's written purchase order to M & T. M & T's principal, Earl R. Mitchell, appears to have testified without contradiction that in the other instances in which M & T signed over joint checks, the contractor's purchase or-

der specifically provided for joint checks. Mitchell Dep. at 148 1. 8–13. Such use of joint checks, pursuant to a written contract, would be too equivocal to evidence an intention to abide by the same practice without an express agreement. In other words, the evidence does not unequivocally establish that M & T intended to part with legal ownership in the present case.

■ In any event, even if the use of joint checks had not been an express contractual purchase order provision in the prior cases, if M & T acquiesced in the arrangement in the past cases (for example, as a convenience to expedite payment to Capital), but could revoke its acquiescence at will, no trust would have been created. Moreover, the only evidence as to whether M & T and Capital had agreed to such an arrangement in the prior cases is that the arrangement was pursuant to an agreement between Capital and the general contractor (as occurred in the case of Dynalectric (Love Dep. at 40)). Such an arrangement—for the funds owed M & T to be by a check (joint or otherwise) delivered to Capital—made between Capital and the general contractor does not establish a trust. It amounts to nothing more than the type of arrangement involved in Mid–Atlantic, 790 F.2d at 1123, that did not suffice to establish ownership in the supplier. M & T's acquiescence in endorsing the checks to Capital, without an agreement that ownership of the funds was in Capital, would not suffice to establish that a trust existed in the prior cases. In other words, the use of joint checks, without other evidence, does not unequivocally establish that M & T was giving up its ownership of the accounts receivable in those cases.

49. Moreover, the invoice came after part of the equipment had already been supplied, so there could not have been reliance on this invoice with respect to that equipment.

## C. *THE PAROL EVIDENCE DOES NOT ESTABLISH A CONSTRUCTIVE TRUST IN FAVOR OF CAPITAL*

Singleton and F & D also argue that a constructive trust should be imposed upon any funds owed to M & T, because M & T and the IRS entered into a scheme to exchange the check Singleton made out to M & T but gave to Capital for an M & T check for which there would have been insufficient funds in M & T's bank account. The defendants cite to *In re Prime Construction Corp.*, 156 B.R. 176 (Bankr. E.D.Va.1993), in which a general contractor had received a progress payment from the owner by submitting a false certification that it had paid all prior construction costs. Although the court determined that it was premature to decide the question of a constructive trust, it did state that under the common law of Virginia (as opposed to Va.Code Ann. § 43–13) a constructive trust may be imposed upon property obtained by fraud or other improper means, including funds received by a builder under a construction contract. However, this court does not see how a constructive trust can be imposed where, as in our case, no property was ever obtained via the alleged fraudulent conduct.

 Moreover, if the funds were owed to M & T, the federal tax liens had already attached to the funds: the scheme between the IRS and M & T would only have resulted in the IRS receiving in 1994 and 1995 that to which it was entitled, instead of awaiting adjudication of its entitlement in this proceeding. There was no inequitable conduct. Singleton has only itself to blame for failing to protect itself via a contractual provision. It agreed to guarantee M & T's debt to Capital, thereby assuming the risk of nonpayment by M & T upon M & T's recovering payment from Singleton.

Accordingly, the court will partially grant M & T's motion for partial summary judgment as to Count I. With respect to the amounts owed for equipment delivered under the Singleton/M & T Purchase Order, M & T is entitled to recover from Singleton an amount equal to the amount owing on the federal tax liens, but, because of Singleton's right of setoff, is not entitled to recover the balance that it earned.

The court has not attempted to compute the exact amount that Singleton owed M & T. Singleton paid Capital $1,423,681.72. The other parties have not disputed the contentions of M & T and the IRS that Singleton's payments to Capital are an admission that the equipment required to be supplied under the Singleton/M & T Purchase Order was supplied. The IRS's liens, in contrast, totaled only $641,741.05, and even with interest and prepetition penalties, the tax liens would not likely exceed $1,423,681.72 (and any interest to which M & T would be entitled on that $1,423,681.72). The exact amount of the IRS tax liens cannot be fixed until interest and prepetition penalties are added to its liens. Once the IRS submits a calculation in that regard, the court believes that the parties should be able to stipulate to the amount that was owed M & T and as to which Singleton does not have a right of setoff superior to the tax liens. That will be the amount that the court will have to divide between the parties, according to their rank of priority, under Count III.

### IX

Count Two of the amended complaint alleges breach of contract against F & D pursuant to the payment bond for nonpayment of the money due M & T under the Singleton/M & T Purchase Order. Both M & T and F & D have moved for summary judgment on Count II.

F & D does not dispute that M & T is protected by the payment bond it issued on behalf of Singleton for the Dulles Project. Therefore, F & D's liability to M & T, if any, under the payment bond is coextensive with Singleton's liability, if any, to M & T under the Purchase Order.

F & D, however, argues that under the terms of the bond its liability to M & T was extinguished by Singleton's payments to Capital. The court agrees with F & D that payment by Singleton to a claimant extinguishes F & D's liability to that claimant. However, Singleton paid Capital not M & T. As discussed above, Singleton's payments to Capital do give rise to a right of setoff, albeit one ineffective against the federal tax liens. F & D is protected by Singleton's right of setoff, but no more or less than Singleton itself is protected.

Accordingly, the court's rulings, discussed above, in regard to Count One will also control Count Two.

## X

Count III of the amended complaint seeks the court's determination of the extent, validity and priority of the potential interests of Singleton, Capital, the IRS, F & D, C & A, and the Maryland Comptroller in the funds owed to M & T by Singleton and F & D. The court has already determined that as between Singleton's right of setoff and the IRS tax liens, the tax liens have priority over any funds earned by M & T. Moreover, the IRS and F & D agree that as between the two of them, F & D's security interest in M & T's accounts receivable is inferior in right to the tax liens covered by the IRS' first two tax lien notices, but superior in right to the tax liens covered by the IRS' third tax lien notice (and, it follows, superior to the tax lien for which no notice was filed).[50] DE Nos. 103, 108.

The court agrees with the IRS that F & D should be required to make an accounting of all payments it has already received from M & T so that the remaining balance of its security interest can be determined. Moreover, because of interest accruals and other additions,[51] the record does not permit an order fixing the amount to which each claimant is entitled.

C & A and the Maryland Comptroller failed to respond to the motions for summary judgment. Accordingly, they will be treated as conceding the priority of the IRS and F & D.[52]

▋ Singleton's right of setoff takes priority over F & D's liens. A surety's "rights relate back to the dates of the

---

50. As noted previously, to secure F & D with respect to obligations M & T incurred to F & D in other transactions, F & D had a security interest against M & T's accounts receivables.

51. F & D urges that in chapter 7, any penalties secured by the tax liens would not be recoverable by the IRS. *See* 11 U.S.C. §§ 724(a) and 726(a)(4). But the case is not pending in chapter 7, and if it were, the chapter 7 trustee would be entitled to preserve the lien for penalties for the benefit of the estate. *See* 11 U.S.C. §§ 551 and 724(a). Accordingly, Singleton's and F & D's rights would suffer the same fate in chapter 7 or chapter 11, except that any claims they have against M & T would look for payment from a larger pool for unsecured claimants in chapter 7.

52. The Maryland Comptroller has answered neither the original complaint nor the amended complaint, but the plaintiff has not caused a default judgment to be sought against the Maryland Comptroller. C & A has answered the original complaint, but not the amended complaint, and did not respond to the motions for summary judgment. The complaint alleged that C & A held a security interest in accounts receivable of M & T. However, C & A has not produced any evidence that it properly perfected its security interest or when it did so.

surety contracts, ... the dates the bonds were issued." *International Fidelity Ins. Co. v. Ashland Lumber Co.,* 250 Va. 507, 463 S.E.2d 664, 667 (1995) (citing *Dickenson v. Charles,* 4 S.E.2d at 354–55). The bond in favor of Capital predated M & T's agreeing to supply equipment on the Dulles Project. Accordingly, Singleton's right of setoff relates back to a date that predates F & D's liens attaching to the amounts owed to M & T, so that Singleton's right of setoff is superior to F & D's liens but junior to the federal tax liens, some of which are junior to F & D's liens. This presents a circular priority question. Under *United States v. City of New Britain,* 347 U.S. 81, 74 S.Ct. 367, 98 L.Ed. 520 (1954), the amount to which the federal tax liens are junior is set aside and divided according to state law between the other claimants, with the balance being paid to the IRS. This means that Singleton will effectively step into F & D's shoes.

An exact determination of the dollar amount of priority of the various claims to any funds owed by Singleton to M & T must await the trial or subsequent motions for summary judgment.

### XI

■ Count IV of the amended complaint seeks to require Capital to disgorge the funds it received from Singleton, because those funds are directly traceable to payments received by Singleton from Mortenson based upon certifications submitted by M & T to Singleton. This count is apparently based upon a constructive trust theory.

However, as discussed above, Virginia law does not impose a constructive trust upon construction contract proceeds for the benefit of unpaid suppliers; and absent a constructive trust, Singleton was free to use the funds it received from Mortenson as it pleased. Moreover, at oral argument counsel to M & T conceded that a constructive trust does not apply to this case, and, therefore, the funds paid by Singleton to Capital did not belong to M & T. Tr. at 28 (DE No. 124).

For the foregoing reasons, Count IV of the amended complaint will be dismissed.

### XII

■ Count V of the amended complaint seeks to recover as a preferential transfer the money paid to Capital by Singleton. Section 547(b) of the Bankruptcy Code allows the debtor-in-possession to recover certain transfers of an "interest of the debtor in property." 11 U.S.C. § 547(b).

However, payments made by a debtor of a bankrupt to a creditor of the bankrupt pursuant to a direct legal obligation are not avoidable as preferences, because the payments do not constitute property of the estate. *See Gold v. Alban Tractor Co.,* 202 B.R. 424 (E.D.Mich.1996); *In re Flooring Concepts, Inc.,* 37 B.R. 957, 961 (9th Cir. BAP 1984). Moreover, counsel for M & T conceded at oral argument that the payments made by Singleton to Capital were not M & T's property.[53] Tr. at 28 (DE No. 124).

For the foregoing reasons, Count V of the amended complaint will be dismissed.

### XIII

■ Count VI of the amended complaint alleges a cause of action against

---

**53.** The main arguments made by M & T and the IRS in their briefs against Capital's motion for summary judgment are (1) Singleton's independent obligation to pay Capital is a material issue of fact in dispute and (2) Capital had no right to payment because of the "pay-when-paid" provision in the M & T/Capital Purchase Order. However, these arguments have been rejected by the court in parts III and IV of this decision.

Capital and Singleton for wrongful conversion of a $286,080.10 check that Singleton made payable to M & T but delivered to Capital. Singleton, Capital and M & T each have moved for summary judgment in regard to Count VI.

M & T has conceded that because the check was never delivered to M & T, the conversion action is barred under the Virginia UCC.[54] M & T's Supp.Reply Mem. (DE No. 113.) However, M & T argues that the laws of Maryland and the District of Columbia are also applicable to this cause of action, because at least two of the acts of conversion took place in Maryland and the harm took place in the District of Columbia; and the versions of the UCC in effect in Maryland and the District of Columbia at the time of the alleged conduct did not require delivery as a prerequisite to a conversion claim.[55]

The prior UCC § 3–419 provided as follows:

(1) An instrument is converted when:

(a) a drawee to whom it is delivered for acceptance refuses to return it on demand; or

(b) any person to whom it is delivered for payment refuses on demand either to pay or to return it; or

(c) it is paid on a forged indorsement.

M & T has not cited to a single case factually similar to ours in which a party was found liable for conversion. Moreover, the court's review of former UCC § 3–419 does not identify any provision that would cover our facts.

More fundamentally, the court does not understand how a payee can maintain a cause of action for conversion when the payor never intended the payee to have dominion over the negotiable instrument. If a conversion action could be maintained under the facts of this case, then it would logically also lie whenever a payor decided to stop payment on the instrument. The case before the court is a far cry from one involving a stolen instrument, a situation in which a reasonable argument could be made in favor of allowing a payee to maintain a conversion action regardless of delivery.

For the foregoing reasons, Count VI of the amended complaint will be dismissed.

## XIV

Count VIII of the amended complaint (the count following Count VI) seeks to recover as a preferential transfer an alleged assignment made by M & T to F & D on July 29, 1994. F & D has moved for summary judgment on Count VIII and M & T has filed an opposition thereto.

Section 547(b) of the Bankruptcy Code allows a debtor-in-possession to avoid certain transfers of interests of the debtor in property made for the benefit of a creditor "on or within 90 days before the date of the filing of the petition" or "between ninety days and one year before the date of the filing of the petition, if such creditor at the time of such transfer was an insider." 11 U.S.C. § 547(b)(4).

Because M & T filed its bankruptcy petition on January 17, 1995, more than 90 days after it made the assignment to F & D, the transfer can be avoided as a prefer-

---

**54.** The Virginia UCC provides that an action for conversion of a negotiable instrument may not be brought by "a payee or indorsee who did not receive delivery of the instrument either directly or through delivery to an agent or co-payee." Va.Code Ann. § 8.3A–420(a)(ii).

**55.** The parties apparently agree that the current versions of the UCC in Maryland and the District of Columbia bar an action for conversion where the payee did not receive delivery of the instrument.

ence only if F & D was an "insider". M & T alleges in the amended complaint that F & D was an "insider" by virtue of having been "in control of the debtor." 11 U.S.C. § 101(31)(B)(iii). F & D disputes this allegation in its motion for summary judgment.

As the Supreme Court has made clear, summary judgement is appropriate "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). M & T bears the burden of proof at trial as to the existence of each element of a preference, including F & D's alleged status as an "insider".

■■■■ However, M & T has not referred the court to any evidence supporting its allegation that F & D was an "insider", but, rather, simply stated in its opposition to F & D's motion for summary judgment that "there is a question of fact as to how much control F & D was exercising over M & T . . . ." (DE No. 105.) Under the standard established by *Celotex,* such a bald conclusion is inadequate to defeat a motion for summary judgment.

For the foregoing reasons, Count VIII of the amended complaint will be dismissed.

## XV

Capital has asserted a cross-claim against F & D and Singleton. The cross-claim seeks reimbursement from Singleton and F & D, to the extent that Capital is found to be liable to M & T under Counts IV, V and VI of the amended complaint.

In light of the court's decision to dismiss Counts IV, V and VI of the amended complaint, Capital's cross-claim will be dismissed as moot.[56]

## XVI

The court will issue an order in accordance with this decision after the parties address at the next status conference whether those counts to be dismissed should be dismissed by an order made final and appealable under F.R.Civ.P. 54(b).

---

56. Capital is also named as a defendant in Count III of the amended complaint, which seeks a determination of the various parties' interests in any funds Singleton may owe M & T. Capital, however, has no interest in any such funds, because it already has been paid in full by Singleton and pursuant to this decision will have no liability to M & T.